Gridley, J.
 

 — On the 2d day of April 1804, Dederick Shafer made his last will and testament, by which he
 
 *254
 
 devised to his three sons, Dederick, Daniel and Frederick, the three farms on which they then resided; and bequeathed to his daughter a legacy, the interest of which he directed to be paid to her annually, by his executors. The testator died in 1807, leaving the will unrevoked and in full force. In the winter of 1820, the three sons concluded to release to each other the remainders in the farms they respectively occupied under the will of their father; in which release, their sister, Elizabeth Sears, was induced to unite, on the ground, as was stated on the face of the release, of a conviction that it was the intention of the testator, to devise an estate in fee-simple, instead of a life-estate. The release in question in the present suit was executed to Frederick Shafer, under whom the defendants claim
 
 title;
 
 and the plaintiffs are the heirs-at-law of Elizabeth Sears, who filed their bill to set aside the release, on the ground that it was procured by fraud and undue influence. The cause was brought to a hearing before Mr. Justice Barculo, at a special term, who granted the relief sought by the bill. A re- * ova i heai’in& *was had, and the supreme court in the y -* second district reversed the decree of Justice Barculo; but without prejudice to the right of the plaintiffs to prosecute an ejectment, at law, to recover the remainder, to which they preferred their claim. From that decision the plaintiffs have appealed to this court.
 

 It is not our purpose to go into a detailed examination of the voluminous mass of evidence contained in the case, but simply to state some general propositions of fact, which we regard as established by the testimony, and which are abundantly sufficient to authorize a court of equity to grant the relief sought by the bill.
 

 A court of equity interposes its benign jurisdiction, to set aside instruments executed between persons standing in the relations of parent and child, guardian and ward, physician and patient, solicitor and client, and in various other relations in which one party is so situated as to
 
 *255
 
 exercise a controlling influence over the will and conduct and interests of another. In some cases, undue influence will be inferred from the nature of the transaction alone; in others, from the nature of the transaction, and the exercise of occasional, or habitual, influence. The following authorities will show the existence of the principle, and the character and degree of influence against which the court will relieve.
 
 (Casborne
 
 v.
 
 Barsham,
 
 2 Beav. 75; Hill on Trustees 156, 157, 158, 159, 162;
 
 Dent
 
 v.
 
 Bennet,
 
 7 Simons 539; Story’s Eq. Jur. §§ 308-324;
 
 Wood
 
 v. Downes, 15 Ves. 120;
 
 Huguenin
 
 v.
 
 Basely,
 
 14 Id. 273.)
 

 I. The relation which the Shafers, who procured the execution of the release, bore to Elizabeth Sears, was that of brother; they were executors of their father’s will, and the trustees of the legacy bequeathed to her; and were the habitual and confidential advisers of their sister, who was then a widow, and in ill health. It is scarcely possible to imagine a more intimate and influential relation than that held by Daniel, one of the brothers, toward his sister, at the time when the release was executed. She was accustomed to rely on his advice, in all her business matters, and to follow it implicitly. This influence on the one side, and a yielding compliance on the other, was increased by the circumstances *in which Mrs. Sears was placed during the last part of her life. She was, habitually, of *• an uncommonly “ mild and amiable character, and in cases of difficulty, very yielding in her disposition.” During the winter of 1820, immediately preceding her death, she was in a hopeless condition, from the effects of a cancer, which had been pronounced incurable by her physician, and which was rapidly hurrying her to the grave. During this period, while she was mostly confined, to her bed, suffering excruciating pains, and enduring great mental prostration, Daniel had many secret and confidential interviews with his sister, and at
 
 *256
 
 one time, carried her in a sleigh to his own house, where some writings were executed. It is not clear from the evidence, whether the release in question was executed there or not.
 

 Now, we can only conjecture, what was the subject of the most of those secret interviews, because her own confessions to her nurse, which are detailed in the case, are not evidence in favor of her children. But there is one interview which was in part overheard by a witness, which gives us a clue to the others. Mary Sears testifies as follows: “ I was in the room, when her brother came in, and I went down stairs, and left him with my. stepmother, and after he had been there some time, I went up stairs again, to go into the room, and the door was standing a little open and I heard her speaking quite loud for her, in such a feeble state, which induced me to stand a moment at the door to hear; and I heard her tell him, that she was not willing to sign any more papers; that he had compelled her to sign those papers that she had signed before, against her will, and she was very sorry for it; and he appeared to be quite • out of humor.” We are not advised of any other papers, which she executed during this period, than the release in question ; and we are justified in believing, that this conversation had reference to some one of the releases executed to her brothers, during that winter.
 

 II. The release (though a pecuniary consideration appears upon the face of the deed) is conceded to have beengranted without any other consideration than a belief that it was the intention of the testator to devise * 274 1 an es*a*e inheritance *instead of an estate for •i life, and a desire upon her part to effectuate that intention. The releases were prepared beforehand, and probably as early as November 1819, judging by the date of that executed to Daniel, which is in November 1820, some four months after the death of Mrs. Sears. Nqw, November is the time when she went to New York
 
 *257
 
 to take surgical advice in relation to her disease, and when she returned with the information that the cancer was incurable. The release was, doubtless, then prepared, with a blank for the year, which was afterwards filled up, without altering the month. It is not clear, that Mrs. Sears understood the full effect of the paper she executed; she could not read or write English, and though it is said by the widow of Daniel, that the paper was read over, before it was executed, yet the witness was so far advanced in years, and her memory so feeble, that but little reliance can be placed on the accuracy of her recollection; she herself says, that though she thinks she and her husband signed the release, at the same time, yet “
 
 it appears like a dream to her”
 
 And if we should suppose it to have been read over in her presence, how accurately she comprehended the technical language of the instrument, in her feeble state of body and mind, and with her imperfect knowledge of the English language, it is impossible to conjecture.
 
 [1]
 

 III. The conduct of the grantees in those releases is indicative of a want of confidence in their validity. They were not put on record, till after the year 1840, and just before the death of the tenants of the life-estates. The arrangement, too, between Frederick Shafer and Jacob his brother, and the execution of bonds by the defendant to Jacob, to pay eight hundred dollars,
 
 “provided
 
 Jacob should indemnify them against the claims of the heirs of Elizabeth Sears, to the farm,” affords strong proof that there were great doubts, entertained by the parties, of the validity of those releases.
 

 IV. Another striking feature of the transaction in
 
 *258
 
 question is/that the remainder which Mrs. Sears was induced to release was the inheritance of her children, and could not, in the ordinary ^course of things *275 ] be enjoyed by her; she was, at the time, a hopeless invalid, hastening .to the grave, under the effect of a most painful malady, and with only a few months of life before her. Could she expect to survive her brothers, and enjoy the estate she was releasing? And does it comport with the instincts of maternal love, to strip her children of their legal rights, and cut them off from their inheritance ? And would it not require the application of powerful motives to a mother’s heart, to induce her to surrender to her brother, the pittance which the law had given to her children ? It does not appear, that there was any other proof of the intention of the testator, than what was derived from the language of the will itself, which, by a fixed legal construction, gave only a life-estate to the devisees.
 

 V. The respondents have made a point that the court will hold the plaintiffs barred by lapse of time, in analogy to the statute of limitations; and it is said, that Mrs. Sears died in July 1820, and, therefore, that twenty-six years elapsed before the bill was filed. It is sufficient to say to that argument, that there is no such ground assumed in the defendants’ answer, and if there had been, then, there is no evidence that the fraudulent procurement of the release was known to the plaintiffs, till they were placed on record, and less than five years elapsed from that event, before the filing of the bill. By the 51st section of the title of the revised statutes, “
 
 Of the time of commencing
 
 actions,” it is provided, that, “bills for relief on the ground of fraud, shall be filed within six years after the discovery, by the injured party, of the facts constituting the fraud.” This bill was filed within that period; this circumstance seems to afford a sufficient answer to the objection,
 
 [2]
 

 
 *259
 
 The decree of the supreme court at general term should be reversed, and the decree made at the special term affirmed, with costs in the court below.
 

 Decree reversed, and that of the special term affirmed.
 

 [1]
 

 It is well settled, that where parties occupy a confidential relation to each other, a contract between them must be
 
 affirmatively
 
 shown to he fair and lust, and not procured by fraud or undue influence. Siemon
 
 v.
 
 Wilson, 3 Edm. Ch. 36 ; Fish v. Miller, Hoff. Ch. 267 ; Bergen
 
 v.
 
 Udall, 31 Barb. 9 ; Gould v. Gould, 36 Ibid. 270 ; Comstock
 
 v.
 
 Comstock, 57 Ibid. 453 ; Ross v. Ross, 6 Hun 80.
 

 [2]
 

 Erickson v. Quinn, 47 N. Y. 410