Haight, J.
Milton Budlong died at Perrinton, Monroe county, on the 29th day of April, 1880, at the age of seventy-nine years, leaving him surviving, his widow, Louisa Budlong; and three sons, Isaac Budlong, Schuyler Budlong and Levi S. Budlong; and three daughters, Elvira B. Hunt, Rena Root and Louisa J. Cole, his only heirs-at-law and next of kin. He had been a successful farmer and cattle grazier and left a valuable estate.
The will in question was executed by him on the 4th day of January, 1880, and provides:
First. For the paying of his debts and funeral expenses, and for the support of his wife according to her .station in life, and makes the same a charge upon his real property.
Second. He gives and bequeaths to his daughter Elvira B. Hunt, two houses and lots in the village of Fairport.
Third. He gives and devises to his two sons, Schuyler and Isaac, all his personal and real property which he shall possess at the time of his death; one-third to Schuyler and two-thirds to Isaac. .
Fourth. He gives and bequeaths to his dauther Rena Root, the sum of $5,000.
Fifth. He gives and bequeaths to his daughter Louisa J. Cole, five dollars. -
Sixth. He gives and bequeaths to his son Levi S. Bud-long, $5,000, which he charges upon the portion which he gives to his son Issac.
Lastly. He appoints his three sons executors.
It will be observed that the last three bequests follow the fift and devise of all of his property, real and personal, to is two sons, Schuyler and Isaac.
This will was offered for probate upon the petition of Isaac Budlong, and on the return day, his daughter Louisa J. Cole, filed an answer contesting the probate upon the grounds:
First. Thar the instrument offered for probate was not the last will and testament of her father.
Second. That he was not, at the time of its alleged execution, of sound and disposing mind and memory, and
Third. That the same was procured to be executed by fraud, circumvention, undue influence and deceit, practiced upon him by Isaac Budlong and the other proponents of the will, or other persons acting in their behalf, while there *545 was a loss of natural affection by her father for her, occasioned by the falsehoods, fraud, deceit and evil practice of proponents, perpetrated upon decedent for the purpose of unduly prejudicing him against her.
The surrogate found as facts, that the proposed will was executed by the decedent in due form, and that all the requirements of law had been duly complied with, and that at the time, althougn sick with pneumonia and apprehensive of death, and about seventy-nine years of age, was of sound and disposing mind and memory and competent to make a will.
The surrogate further found that the deceased had been sick from Thursday night, previous to the execution of the will, and that no mention or suggestion had been made by the decedent or any one around him that he should make a will, nor was the subject referred to until after Isaac Bud-dong came and sat up with his father Saturday night.
That during the night he was taken worse, when for the first time during his sickness the subject of the will was mentioned, and that it was then suggested by the decedent himself, and the draftsman was selected and sent for by him, and that he dictated the terms thereof, and that the same was written in accordance therewith. That before executing the will it was read over to him; that during such reading Mrs. Budlong interrupted, saying that the bequest to Levi was not right, and asked him if he was going to give Levi anything but the $5,000, and he replied, “That is all.” That the will was read over to him three times, and was well understood by him, and he declared it was correct and as he wanted it should be. That he recovered from the sickness that afflicted him at the time and was able to attend to the ordinary affairs of the farm and other business until his death, which occurred on the twenty-ninth day of April thereafter. That after his recovery bis attention was called to the will by his wife, and he was asked if it was as he wanted it, and he refused to change it. That on many occasions during the last twenty-five years he expressed himself to the effect that he should never make a will, and stated in substance that the law of the state of New York made a good enough will for him. That his children were all alike to him and that he knew of no difference among them; one was as near as another, and that the girls should have as much as the boys. On other occasions he expressed the contrary intention, declaring that neither George Cole nor his wife should have any of his property.
The surrogate further found as facts that the will is contrary to the dictates of nature and grossly unjust; that the *546 deceased left an estate of one hundred thousand dollars and upwards in value; that the sons were all men of large property which they have acquired for themsélves. That two of the daughters were married women, neither of them having any separate estate, and that Mrs. Hunt was broken in health, with an imbecile son dependent upon her for support, and had an estate of about seven thousand dollars left her by her deceased husband That no explanation is given or reason shown for the change of purpose of decedent towards Mrs. Endlong. That be. had declared to her only four or five years before, at a time when she said to him if there was anything there belonged to her she-wanted to know what it was; that he should never make a will; and at another time he stated to a neighbor that although she was not the mother of his children that she had always been kind to him, and if he was taken away she should have the use of one-third, and he hoped she-would not give it up. That nothing appears subsequently, to show any change of intention until the making of the will, and then no reason for the change appears. That it-was testified to that he said that with Mrs. Root’s extravagant way of living, more would do her no good, and that Mrs. Hunt was a good manager and had enough and did not need more. That there was no evidence tending to show that Mrs. Root’s mode of living had changed during the last twenty years, and no estrangement had occurred between him and his daughters, Mrs. Root or Mrs Hunt. That within two or three days after the will was made, Isaac and Levi entered into an agreement in writing, by which they agreed to divide equally what they were to receive under the will. That in the fall of 1876 he had a dangerous and painful operation performed upon his eyes, and subsequently became nearly blind and feeble in health, and from that time he became dependent upon his sons for the transaction of his business.
That in the spring of 1877, Mrs. Cole removed with her husband to a farm in Livingston county, N. Y., and from that-time to the time of her father’s death, she had little opportunity to see or visit him, and that the transaction of the business of the decedent by his sons, gave them occasion to visit him frequently, and their intercourse increased from what it had been in previous years. That decedent opposed his daughter’s marriage to Mr. Cole and was greatly displeased thereat, although Cole was of good family, but within a year or two thereafter he commenced loaning money to Cole, as he had done to his sons, to use in his business. That when they removed to Michigan, he entrusted Cole with his business in that state. That soon after their removal he took measures to get them back. *547 He first contemplated the purchase of the Eldridge farm near his home with the view of letting Cole have it, and requested them by letter not to purchase land in Michigan until after he found whether he could purchase the Eldridge farm. That when Mrs. Cole was sick in 1876, he manifested anxiety and regard for her, and assured her that if she should not live her children should have her share of his estate, and in the spring of 1879, he said to Schuyler that he was glad that he was assisting Mr. Cole in his business by endorsing for him.
The surrogate further found that one of the reasons the decedent had for disinheriting Mrs. Cole, was the belief that she had turned against her brother Levi to assist his wife in preventing Levi from getting a divorce from her. That Levi had married a domestic in the family without the knowledge of his father until after it had occurred. That when he heard of it he suffered great agony and grief. That he sent Levi off to Michigan, and at first refused to be reconciled to him, but afterwards took him back on the Biver farm. In August,. 1879, Levi separated from his wife and went to Clarksville, Iowa, to the residence of Mrs. Boot, and there commenced an action for a divorce upon the ground of cruel and inhuman treatment, and that it was dangerous for him to live with her. That she followed him to Iowa and' defended the action, and Levi failed to obtain a divorce. That in a letter by Levi to Mrs Hunt, in October, 1879, while in Iowa, and which he caused to be handed to and read to his father, he charged Mrs. Cole with having taken a foremost position to drag his name in the dust, and that she stooped to low vile slanders to accomplish her undertaking, and that she had visited all the Irish shanties, and told the worst falsehoods her mind could imagine to make it appear as bad as possible. That she was the main cause of threatening his life, so that he dared not stay at his own house, and that she had sent his wife, who he termed that “ defraying viper,” after him. That he had no doubt that his wife and others would swear so as to make him a great deal of trouble, and prolong the case so that it never would be settled while he lived, and that it would certainly take all of his property and make him a pauper, and when that is accomplished, he wrote, I suppose Lida (meaning Mrs. Cole), will be satisfied with her undertaking.
The surrogate further found that there was no proof that Levi heard anything in regard to Mrs. Cole’s interference in his affairs, or had in any manner aided or assisted his wife, except that in a letter from Isaac to Mrs. Cole, bearing date September 19, 1879, Isaac says that Levi had heard that Mrs. Cole had been at his house several times since he *548 went away. That Mrs; Cole went to the city the day that Rose (Levi’s wife) went west, and that Rose counseled with Judge Nash, and so Levi concludes that “you aided and assisted her to persecute him.”, In reply to Isaac’s letter, Mrs, Cole wrote Levi stating to him that she had not been at his house since he left.
She also stated that she saw Rose on the cars the day she started for the west, but did not know where she was going; that Rose deceived her by stating that she was going to Perrinton; that she had never known of Rose counseling with Judge Nash. She also had done nothing to assist Rose against him, and that all she had done was in his interest; that she had endeavored to persuade Rose to consent to a separation; that after receiving the letter from Mrs. Cole, Levi returned to New York to visit his father, but did not retract anything in his letter, but supported them by the false statement that his wife had instructions how to reach' him in Iowa on a paper in Mrs. Cole’s handwriting; that she had gone in with the lawyers against him, and that he felt that she was persecuting him; that the decedent conversed wdth Schuyler, Isaac and Levi in regard to it, and said that he believed it was so; and that while he lived he never ceased to feel bad because of her joining with Rose and the lawyers against Levi.
The surrogate further found as facts that the charges were made by Levi against Mrs. Cole, not with the intention to prejudice his father in the distribution of his estate, nor with reference to influencing him in any manner in the making of his will or the will in question; that Levi believed these charges to be true. He further found that during the sickness of the decedent some one of his sons was constantly in attendance, assisting him, and in the management of the affairs of the household, and a portion of the time his daughters, Mrs. Hunt and Mrs. Root, were present; that on Saturday after the making of the will Mrs. Cole came to see her father, and was informed by Mrs. Budlong that it would not be best for her to see him; that he had said that he could not see her; that it would kill him. The reason was given that she had joined with the lawyers against his “ darling son, darling boy/" and he could not see her in his present condition; that at this time Levi, Mrs. Root, Mrs. Hunt and Schuyler were all in their father’s house; the decedent was not informed of Mrs. Cole’s visit at that time; that when Mrs. Cole stood in the hall, about leaving the house, Schuyler and his father were engaged in conversation about the cattle and cattle market so loud that their voices could be heard in the hall; that neither Schuyler, Levi nor Mrs. Hunt saw Mrs. Cole, nor did Mrs. Cole see her father; that the fact that a wflll had *549 been made was concealed from the daughter, and the attending physician was requested not to inform Mrs. Cole of the will, and that he and Isaac resorted to deceit to prevent the sisters from learning the fact.
The surrogate further found that the decedent at the time of the making of the will was not in any condition to be easily influenced or defrauded into making any will contrary to his deliberate judgment, and that he could not have been unduly influenced, except by deception and falsehood, and as .a conclusion of law that the will should be admitted to probate.
We have thus referred to the decision of the surrogate in extenso for the reason that there are but few exceptions, and the main facts in the case are established by it. The contestants excepted to the finding that he was of sound and disposing mind and memory and was competent to make the will in question, and at the time of the making of the will he was not in a condition to be easily influenced or defrauded into the making of any will contrary to his deliberate judgment. They further excepted to the finding that the charges were made by Levi against Mrs. Cole, not with the intention to prejudice his father in the distribution of his estate, nor in reference to influencing him in any manner in the making of his will, and that Levi believed the charges to be true.
As to the question whether he was of sound and disposing mind and memory at the time of making the will we shall have but little to say. ’ The evidence tends to show that he was then about seventy-nine years of age, very sick with pneumonia, and apprehensive of death. That at times he had been delirious, and in the night grew worse, and had a sinking spell, so that his family was much alarmed and sent for the doctor and the lawyer in the night time. That for the last two or three years, and ever since he had the operation performed upon his eyes, he had changed from his former self, becoming more irritable and nervous and changeable in mind, so that in the same conversation he would assert first one way and then another. That he grew physically weak, and would wander from his home into the lot and get lost, so that his folks would have to go for him and bring him back. That formerly he was a man of strong, resolute will and self-reliant in the exercise of his judgment, but towards the last he was easily influenced by the persons with whom he last conversed sc that after their departure he would constantly refer to what they had said and done or advised. He often referred to an attempt of a neighbor’s son to have the property of his father taken from him because of his incompetency to care for it, and then would question his hired- men if he was *550 capable of taking care of his property, and how he would swear as to his competency in case there should be any effort made to take his property from him. Said that the boys were not satisfied with what he was doing, and wanted to put him in the insane asylum. That they could not get hold of his property quick enough.
There was other evidence on the part of the proponents tending to show that whilst he was physically weak and dependent upon his sons to transact his business that his mind was not impaired, and that he was capable of making a will. So that, upon this branch of the case, a fair question of fact was presented for the determination of the surrogate with which we should not be inclined to interfere were we satisfied in reference to his conclusions upon the other questions presented.
We are next called upon to consider whether the will was procured to be executed by fraud, circumvention, undue influence and deceit practiced upon him. As we have seen, the surrogate has found that the will is contrary to the dictates of nature and grossly unjust, and that the real reason for disinheriting Mrs. Cole was that she had turned against her brother Levi to assist his wife in preventing Levi from getting a divorce; that Levi had written a letter to Mrs. Hunt accusing Mrs. Cole of this, and charging her with having taken a foremost position to drag his name .in the dust, and that she had stooped to low, vile slanders to accomplish her undertaking; that she had visited all the Irish shanties and told the worst falsehoods her mind could imagine to make it appear as bad as possible; that she was the main cause of threatening his fife so that he dared not stay in his own house; that she had sent his wife, that “destroying viper,” after him, and had wound up by requesting that she should show the letter to his father; that there was no truth in the charges, and no proof that Levi had ever heard any such thing of his sister, and that when he returned to New York he visited his father and did not retract any of the charges made in his letter, but supported them by the further false statement made to his father that his wife had instructions how to reach him in Iowa on a paper in Mrs. Cole’s handwriting; that the father believed him, and yet the surrogate has found that the charges were not made by Levi with the intention to prejudice his father against her, or to influence him in the making of his will, and that he believed the charges to be true.
We confess we cannot well reconcile these findings. If the charges were not made to the father for the purpose of prejudicing him against his daughter, why were they made to him at all ? He was an old, feeble man in the seventy- *551 ninth year of his age, in the last year of his life, irritable and nervous, and it was entirely unnecessary to have burdened lhs mind with the pretended misconduct of a child, and yet Levi, in his first letter to Mrs. Hunt making the charge, is careful to request that the letter be shown to and read over to his father.
Again, if the charges were made without his ever having heard anything of the kind in reference to his sister, what right had he to believe them to be true, or to falsly charge upon his sister the giving to his wife of directions to find him in Iowa ? But it is urged on behalf of the proponents that the findings of the surrogate are too favorable to the contestants in this regard, and, under the provisions of section 2586 of the Code of Civil Procedure, we are called upon to examine the whole evidence and are given the same power to decide the questions of fact which the surrogate had.
We have consequently carefully examined the entire evidence appearing in the appeal book and have reached the conclusion that the findings are not more favorable to the contestants than they should be. It appears that after Mr. and Mrs. Cole removed to Michigan that the decedent was quite anxious to get them back, and much concern and affection was expressed by Mm for his daughter, Mrs. Cole, in the letters that were written by his direction at that time. They were finally induced to give up their farm in Michigan and return. They were placed upon the Eiver farm, so-called, contaming about 1,000 acres, and a farm across the river containing about 400 acres. Cole was employed to superintend these farms upon a salary of $500 per year. So far as appears from the evidence things appear to have passed pleasantly for two or three years, when a difficulty appears to have occurred between Cole and Isaac. Isaac had purchased a lot of cattle and shipped-them to his home. They were taken from the cars and temporarily turned in a yard upon the Eiver farm which Cole was superintending. During the night the fence was broken down and the cattle became mixed with the cattle owned by Mr. Budlong. The next morning Cole separated the two herds of cattle, and subsequently a son of Isaac drove the herd to Ms own farm. Shortly after this Isaac called on Cole and accused him of stealing some of his cattle. Angry words followed, in which it is contended, on the one side, that Isaac called Cole, his wife and children vile names, and, on the other side, that Cole threatened to shoot Isaac if he did not leave the place. The evidence as to what took place is conflicting. Cole demes the charge that he threatened to shoot, but if we take the testimony of Isaac’s witnesses in reference to the transaction it shows that Isaac *552 was the first and chief aggresssor in the matter, and the words that followed were spoken in the heat of passion. Cole-had no motive to deal unjustly as between his father-in-law and Isaac in separating the cattle. Two large herds had, without fault on his part, become mixed and it is not-surprising that, in separating strange cattle, some mistakes, should have been made.
There was no reason, therefore, for Isaac to accuse his brother-in-law of stealing his cattle. From this time on the trouble in this family seems to have thickened. Isaac appears to have been jealous in complaining of Cole and his wife, not only to his father, but to his brothers and sisters. Mrs. Cole was accused of meddling in reference to the Wadsworth farm, which had been leased to Mr. Bud-long for many years, and preventing the agent from renting it to him longer. Mr. Budlong stated that she had, and when asked how he knew, stated that his sons had told him so, and yet when Allen, the agent for the Wadsworth estate, is put upon the stand he testified that-she had never spoken with him upon the subject. Letters were written and read to Mr. Budlong charging Cole with drunkenness and his employees upon the farm of drinking; complaint was made in reference to his management of the-cattle and the lots in which he turned them for pasture. The next year Cole’s salary was cut down from five hundred to three hundred dollars. Hot only did the sons, but-their sons, become accusers and diligently report to Mr. Budlong every circumstance which would tend to prejudice-him against Cole. After Levi went to procure a divorce from his wife, Isaac appears to have championed his-charges against Mrs. Cole. He writes her stating what Levi had heard in reference to her conduct, and states that he hinted at occurrences that took place long ago; that he would not write what he said, but that Levi had given him to understand that if Mrs. Cole did not let him alone he would expose things that made him shudder to contemplate. Then in his postcript to the letter he states that-he never heard before of those dark things that Levi alludes to, and states it is in your power to squelch it- or make them public. And yet in the letter which Levi had written charging Mrs. Cole with having dragged his name in the dust and taken sides with his wife to‘'prevent his obtaining a divorce no such charge appears. On the trial, Isaac becomes the chief witness, attempting to show that Mrs. Cole, years before her marriage, on an occasion when she visited him in Hew York, was absent in the company of a young man by the name of Rice two or three days. The evidence, in our minds, satisfactorily explains- and-fully repels this charge. Hot only this, but he appears *553 to have applied to his brother Schuyler’s wife and procured her to write Mrs. Cole advising her that she could have no further communication with her on account of the course she had pursued. In reference to the making of the will, it appears^ that Isaac had a talk with his father on this subject a few days before he was taken sick. That nothing had been said upon the subject after he was taken sick until Isaac arrived. He sat up with him that night until he grew worse. The only evidence as to what took place between Isaac and his father on this occasion is necessarily limited to the testimony of Isaac, who disclaims any mention of the subject himself until after his father had been taken worse and the family called up and himself sent for a draughtsman. It, however, appears that by the terms of the will Isaac was given two-thirds of all the real and personal property and Schuyler one-third, and that when the will was being read that Mrs. Budlong interrupted and inquired of her husband if $5,000 was all that he was going to leave Levi, and he remarked that it was. That thereupon Isaac beckoned his step-mother out of the room and gave her to understand that it was understood that he was to divide with Levi.
We are hardly able to reconcile this circumstance with the theory that nothing had been said between him and his father upon the subject. The evidence tends to show that Levi possessed the confidence and affection of his father; that the father called him his darling son and was incensed at any interference with his son’s attempt to procure a divorce and that he made him one of the executors of his will. We can hardly believe, that it was the intention of the father to substantially disinherit him, or cut him off with $5,000, and yet this would appear to be his intention unless he had had a previous understanding with Isaac to the effect that he was to divide with Levi.
In the case of Tyler v. Gardiner (35 N. Y., 559), it was held, that when it appears from the proof that the will was made by a testatrix on her deathbed, that her faculties were enfeebled by long and wasting disease; that she had been for a considerable period under the influence of the principal beneficiary; that during this period she had been imbued with causeless antipathy to her only son and had been induced to expel him from her house and pursue him with unmerited accusations; that the will originated with the chief beneficiary, who framed the written instructions, engaged the counsel and superintended the execution; that it involved a complete revolution of intention and an entire departure from the previous testamentary disposition; that it was made under mistaken "impressions of fact recently im *554 bibed and vitally affecting its provisions; these facts coupled with gross inequality and apparent injustice in disposing of the property raised a presumption of undue influence.
In the case of McLaughlin v. McDevitt (63 N. Y., 213, 217), the rule was stated as follows: “A decedent has of course a right to change, radically and arbitrarily, the manner of disposing of his property and in the absence of fraud the courts will sustain his action in this respect, but when according to the ordinary motives which operate upon men we find an unnatural change made in a sick man’s will, and one apparently contrary to his previous, fixed and determined purpose, it is the duty of the courts to scrutinize closely the circumstances with' the view of ascertaining whether the act was free, voluntary and intelligent.” See, also, Sears v. Shafer, 6 N. Y., 268.
When we come to take into considération the previous, fixed and determined purpose of Mr. Burlong as declared to his neighbors, friends and minister, on numerous occasions during the last twenty years of his life, to the effect that he should never make a will; that the laws of the state made a good enough will for him; that his children were all alike to him; in connection with the recent facts disclosed by which he had become unjustly prejudiced against his daughter, Mrs. Cole; with his advanced age, feeble contion of body and mind; his severe and dangerous sickness, in which his family and attendants were apprehensive that he would not survive the night, and the fact that the will is contrary to the dictates of nature and grossly unjust, lead us to doubt the correctnesss of the surrogate’s conclusion, upon the question of deception and undue influence.
The decree should, therefore, be reversed and a new trial by jury at the Monroe circuit ordered of the issues:
First. Was Milton Budlong at the time of the execution of the instrument in question of sound and disposing mind and memory.
Second. Was the same procured, to be executed, by fraud, circumvention, undue influence and deceit practiced upon him by Isaac Budlong or the other proponents of the will, or persons acting in their behalf, while there was a loss of natural affection by the decedent for his daughter, Mrs. Cole, occasioned by the falseholds, fraud, deceit and evil practices of proponents perpetrated upon him for the purpose of unduly prejudicing him against her.
That the costs of this appeal abide the final award of costs.
Smith, P. J., and Bradley, J., concur.