Isaac N. Miller, for the motion.

George W. Stephens, opposed.

---

(30 Misc. Rep. 172.)

## In re TABER'S ESTATE.

(Surrogate's Court, Oneida County. December, 1899.)

1. CONTEST OF EXECUTOR'S ACCOUNT—BURDEN OF PROOF.

Though the burden is on contestants to show that an executor has omitted anything from his account of property of the estate in his hands, or that he is chargeable with anything more, if it appears the funds of the estate had passed into his possession, and are not included in the inventory, the burden is then shifted to him to show a sufficient reason for withholding the same therefrom.

2. SAME—LIMITATIONS.

Where an executor claimed that property in his hands belonging to the estate had been given to him by the testator, and contestants claimed the transaction was a loan, and it appeared that the executor had boarded the testator from the time of the transaction until the time of her death, he cannot raise the statute of limitations against claims of contestants, since, if the statute applied, there was no gift, and, if it was a loan, then the payments, by way of furnishing board, would prevent it from running.

3. GIFTS INTER VIVOS—EVIDENCE TO ESTABLISH—SUFFICIENCY.

Not until after a decedent's death were gifts inter vivos claimed by her nephew, who at the time of the gifts occupied confidential relations towards her, which continued to her death, several years after. The only witness who testified to decedent's declarations that she had given anything to claimant was his wife. Other testimony showed that she had made oppo-

site declarations, and she made no mention of any gift to him in her will, though she made him the principal legatee. A paper in claimant's handwriting, signed by her, and purporting to have been executed several years prior to her death, declared, however, that all money given to him during her life was to be independent of what she left him in her will. It appeared that he at first gave her notes for the funds which decedent gave to him, and that he afterwards destroyed them. He wrote to his mother, however, that from a time prior to their destruction his aunt had not given him anything, and, in reply to evidence of declarations impeaching his claim, he stated that he did not remember them. He admitted paying interest, and it appeared that he boarded his aunt for the income of the money, which was a fair equivalent therefor. After her death he endeavored to prevent a contest of his claim by offering money to his brother. He explained this by saying that he made the offer because his brother had not been remembered in the will, and that it was on condition that there should be no trouble. He also proposed a settlement by placing $250 in the inventory of the estate. *Held*, that the gifts were not established.

Proceedings for the judicial settlement of the account of William E. Taber, as executor of Mary Taber, deceased. Decree in favor of contestants.

Theodore Avery (S. M. Lindsley, of counsel), for petitioner.
George W. Maxon (R. C. Briggs, of counsel), for contestants.

WORDEN, S. Mary Taber, above named, died at the city of Utica, N. Y., on the 23d day of August, 1897, at the age of 84 years, leaving a last will and testament, dated March 14, 1894, which was admitted to probate by the surrogate of Oneida county, October 18, 1897, and letters testamentary thereon duly issued to William E. Taber, the executor therein named, who duly qualified and is still acting. By the terms of the said will, William E. Taber was given $2,500, and all the rest, residue, and remainder of the estate was given to her nieces, Rebecca Paterson, Emma Lewis, Harriet Payne, Minnie Neal, and Emily Taber, "widow of my brother Ashley Taber." Emily Taber was the mother of all the legatees named in the will. She died December 1, 1898, and her son Seth Taber was appointed administrator of her estate. December 8, 1897, the executor and petitioner in this proceeding made and filed in the surrogate's office an inventory of the personal estate of the said Mary Taber, deceased, showing assets amounting to the sum of $4,254. There are also included in the inventory notes "deemed of no value," to the amount of $6,564.09, and upon these notes nothing has been recovered, although it was stated by petitioner on the hearing that perhaps 2 per cent. might yet be recovered on $6,043.09 thereof; this being the amount of notes made by one Edward Hurlburt, and held by deceased at the time of her death. It appears that in the year 1890, and prior thereto, the testatrix had an estate estimated to be of the value of about $16,000, which consisted of money, bonds, and mortgages, railroad stock, etc., and that she made investments, placed mortgages, and transacted business of investing her money through Clark & Son, real-estate agents of Utica, N. Y., and also with one Edward Hurlburt, of the same place. Hurlburt failed in January, 1894, and after that time all her investments were made through Clark & Son. It also appears that for about 11 years prior to the death of testatrix (with the ex-

ception of about nine months) she lived and made her home with petitioner and his wife in the city of Utica, N. Y., and that in her business transactions with Clark & Son checks were made by Clark, payable to the order of testatrix, and delivered to petitioner for delivery to the testatrix, and for the last four years of testatrix's life whatever was paid over to her was turned over to petitioner. Checks were made out to her order, and turned over to him, and after the year 1890, testatrix made no investments without consulting with petitioner. As to that, petitioner says, "After 1890, generally, she consulted with me." On the 13th day of July, 1896, testatrix executed to petitioner a power of attorney to transact all of her business matters, which was recorded in Oneida county clerk's office, May 24, 1897, at which time, petitioner says, he commenced acting under it. November 25, 1898, petitioner made up, presented, and filed in the surrogate's office his account as executor, showing a balance (after payment of debts, funeral expenses, and expenses of administration) of $2,932.70, to be distributed to those entitled thereto, subject to his commissions and expenses of this accounting. Harriet E. Payne and Emma Lewis, legatees under the will of Mary Taber, deceased, and Seth Taber, as administrator of Emily Taber, who was also a legatee, contest the account as filed, by their answers in writing, alleging that said account is erroneous, in that the said executor has failed to inventory and account for moneys which came into his hands from the said testatrix to the amount of about $6,400.

I am of the opinion that the evidence fails to show that the executor has funds in his hands for which he has failed to account, unless it be three items, viz. $700, $2,500, and $1,200, amounting in all to $4,400. The evidence bearing upon that point will now be considered:

Samuel R. Lewis, on behalf of contestants, testified: That he was a brother-in-law of the executor, and had had frequent conversations with him in regard to the estate of Mary Taber, deceased. "In May, 1899, had a conversation with him at my house in Utica, in regard to moneys which had been received from the estate, and what had been done with them. He mentioned sums that had been received and turned over to him. He named three amounts, —$700, $1,200, and $2,500. Said there were papers drawn up between them,— papers of agreement. In a subsequent conversation, said those papers had been destroyed by himself."

Emily Lewis, on behalf of contestants, testified: That she was a sister of William, the executor. That at one time she learned that two assignments of mortgages, aggregating $1,200, had been made to William by Mary Taber. "I had a conversation with him. He said they were not exactly given to him; that he was to pay interest to her." That she was present at the conversation between herself, Mr. Lewis, and Mr. Taber, in May, 1899, in regard to this property. In that conversation he stated that she gave him $700 at one time, at another $2,500, and another $1,200. "He said there were papers drawn up, —notes. In a subsequent conversation, said those notes were destroyed by himself. Said those papers were to protect Aunt Mary. Said they were drawn up to protect Aunt Mary. Said the $2,500 came from railroad stock, and the money given to him." On cross-examination she testified that, in the conversation wherein he said the notes were destroyed, he said, "Aunt Mary told him to destroy them."

Seth Taber, for contestants, testified: That he was a brother of William Taber, and had a conversation with him in regard to certain property that had been put in his hands. "He said Aunt Mary had let him have some money, and the interest on it was to go towards her half of keeping the hired girl. I

went to his house, and talked things over, and he made the statement that, if everything went off smoothly, why he would give me $100." He said: "If the others made no contest towards the settlement he would give me $100, but, if they made any trouble, why he wouldn't. That his mother was one of the legatees under the will. That after her death he had a talk with William as to the amount that was coming to her, or to her estate, from the Taber estate. The evening after mother's funeral, John H. Payne and myself went to his house, and we were figuring up the amount that was coming to mother from Aunt Mary's estate, and we could make it only seventy-five dollars, and Will said that there was more than that,—more than enough to pay the funeral expenses. That at that time he figured up his mother's funeral expenses in the neighborhood of $150. That amount was stated to him, and he said that there was more than enough to cover the funeral expenses of mother coming from her estate."

John H. Payne, for contestants, testified substantially as did Seth Taber, in relation to the conversation with petitioner, as above, except that he said he figured the funeral expenses about $225, and that the conversation took place at about 8 o'clock on the 5th day of December, 1898.

Minnie Locke, for contestants, testified: That she was a sister of Mrs. Lewis and Mr. Taber. That Mary Taber, deceased, was an aunt. That she had a conversation with her in relation to her property, and how it was managed. In one of these conversations she stated as to having put her affairs in William's hands. It was in the winter of 1896 or 1897. "Q. Did she say what had been done by her for Will? A. She said she had never done more for him than she had for the other children, except that she had paid for repairs to his house. She came to my house in October, 1896, and stayed until April, 1897." On cross-examination she testified: "Q. How did this conversation arise, in which she said she had not given Will anything? A. I asked her; I asked her right out, if she had given him anything."

Emma Lewis, being recalled, testified further, in relation to a conversation she had with petitioner, William Taber, about two weeks before, in which she said: "I asked him if he had told Mrs. Locke and Mrs. Paterson of the amount of money that Aunt Mary had given him,—the $700, the $2,500, and the $1,200,—and he said, 'No.' And I asked him why, and he said, 'It was nothing to them,' and I said it was just as much their business as it was mine. And he said he never intended to tell me, and he wouldn't have told me, only to stop the lawsuit. He thought it would stop the lawsuit."

Samuel R. Lewis, recalled, said, in regard to conversation with Mr. Taber in relation to destruction of notes or papers, and asked to fix time and place: "A. The place was our house, No. 68 Leah street, and the time was the same as the conversation my wife just referred to. The subject was the money that was said to have been given to him by Aunt Mary, and the matter of notes that he had given, and which he admitted that he had destroyed. I asked him why he destroyed them, and his answer was, 'She said she could trust me.' That was his excuse for destroying the papers." On cross-examination he said: "He told me that Mrs. Taber told him to destroy the notes."

George W. Maxon, for contestants, testified: That he had a conversation with petitioner at his home, on the 4th of March, 1898, in which he stated to petitioner that "some of the heirs feel dissatisfied, and think you have not included in the inventory all the property that should be included. I spoke of two mortgages amounting to $1,200, and said: 'Those mortgages seem to have been assigned to you. Were they given to you?' He said, 'They were sort of given to me.'"

Mary J. Taber, called by the petitioner, testified: That she was the wife of William E. Taber, the executor of Mary Taber. That said Mary Taber lived with them from 1886 until her death, in 1897, with the exception of about nine months. That she took care of her, furnished her a room, and boarded her. That she had conversations with her, in which she stated that she had given her husband money. Several times she mentioned it. "In the winter of 1891 she told me that she was going to give him some money. The next morning they went down street, and the next morning she told me that she had given him $2,500. She told me she gave him $700 and $1,200. Told me different times of giving him money. I cannot fix the dates for the other sums. I knew nothing about her money affairs." That she was not present at any

time when money was passed over to her husband. "All I have was her statement that she was going to do so, and did do so. Q. Do you know whether your husband gave her any papers to represent that money she put in his hands? A. He told me there was some papers given. There was some papers made out right there, and left up in her room, to secure her,—so that, if any-thing happened to him, it would secure her. That is all I know about it. He told me afterwards that she told him to take those papers and destroy them. She never said anything to me about papers. All she knew about the papers at all was from him."

William E. Taber, in his own behalf, testified: That he was the executor of Mary Taber, and during her lifetime she lived with him, with the exception of nine months. That testatrix had no notes against him at the time of her death. That he collected some money while acting under the power of attorney, and that was all in the inventory. In relation to conversation with Mr. Lewis, said he had had conversations "with all these people, not only with him, but with his wife"; and in relation to papers between him and Mrs. Taber, said: "I don't remember what I told him, but I know they were destroyed. I might have told them they were destroyed, but whether I told them the exact time I don't remember. That he did not remember of telling Mrs. Lewis that he had to pay interest to Mrs. Taber." "Q. In the conversation with Mrs. Lewis, in which she accused you of destroying the papers, what did you say in that conversation? A. Well, in the conversation I had with her, I don't remember whether I told her they were destroyed by the order of Mrs. Taber, the same as she says I did." "Q. What did you tell her in relation to papers being drawn up to protect Aunt Mary? A. Well, I couldn't say what I told her." That he told his brother Seth that seeing he hadn't been remembered in the will, that he would give him $100, if allowed to settle it in the regular way, but, if he had to pay the legatees outside of this, that that would not hold. That the $100 offered to Seth was conditioned on there being no trouble. That during all the time that testatrix lived with them she paid board. That certain papers given by him to his Aunt Mary were destroyed by him in May or June, 1893. "Q. Do you remember making the statement to Mrs. Lewis that on all the money that your Aunt Mary had given you, that you allowed her interest, and it was applied on the board? A. It was applied on the board; yes. Q. Do you remember making such a statement? A. Yes, sir. Q. Giving her board was paying interest on the money you had received from her? A. The income of it paid her board. She paid my wife money on board, she didn't pay me. About five dollars of the amount was paid to my wife every week from her own hands, and the balance of it came in from those sums, and applied on the board." He testified, further, that he stated to Mrs. Lewis as follows: "They asked me about the different sums that Aunt Mary had given to me, and I stated the amounts to them. I told them she had given me $700 in 1890, $2,500 in 1891, and $1,200 in 1892. That the amount that she had received from this money before this I agreed to apply on her board and expenses while with us. I did so while she lived. I stated this to Mrs. Lewis. That he never told Mrs. Lewis that the two mortgages, aggregating $1,200, were not exactly given to him. I told her they were given to me." That in the conversation with Mrs. Lewis, in May or June last, in which he proposed to settle the matter, he said he would place $250 on the inventory.

Petitioner also put in evidence paper marked "Exhibit 3":

"Exhibit 3.

"To Whom it may Concern: All money given to William E. Taber during my life I give to him independent and with no reference whatever to what I may leave him in my will.

"Signed this 20th day of Nov., 1893.          .          Mary Taber."

Contestants placed in evidence a letter from the petitioner to his mother, which, so far as material here, reads as follows:

"Sept. 23d, 1897.

"Dear Mother: A month ago to-day Aunt Mary died. I am very sorry that there should be any trouble or feeling over her will. I am sure that I have

no other desire but to carry out her wishes to the best of my knowledge. Aunt has done nothing for me since Jan., 1892, two years before Mr. Hurlburt failed. * * *                                    [Signed]   Wm. E. Taber."

Counsel for petitioner also put in evidence the record of the assignment of two mortgages, which assignment recites that petitioner paid $1,200, as consideration, etc.

The foregoing is substantially all the evidence given in relation to the three sums of money, to wit, $700, $2,500, and $1,200, amounting to $4,400. The petitioner admits that he received from the testatrix in her lifetime these three sums of money, but claims they were a gift from her to him, and that he should not be compelled to account for the same. It appears from this evidence that papers or notes were given by petitioner to the testatrix, and that in May or June, 1893, these notes or papers were destroyed by petitioner, and that testatrix said "she could trust him." Trust him how? Trust him for what? Was she to trust him to pay the principal, or to pay only the interest, or to support and furnish board, etc., for her? In this we are left entirely to conjecture. The record is barren of evidence as to what she was to trust him for.

It also appears that petitioner furnished testatrix her board, etc., for the income of this money, and that before it came into his hands testatrix paid money to petitioner or his wife for her board at the rate of $5 per week, and we may notice here that her board at $5 per week for one year, or 52 weeks, would amount to $260, and that the interest on $4,400 at 6 per cent. for one year would amount to $264. It further appears that testatrix, in 1896 or 1897, a short time before her death, stated to Mrs. Locke that she had done nothing more for Will than for the other children, except to pay for repairs to his house. This, of course, could not be true, if she had given him $4,400 as an absolute gift.

If this was a gift, when did it take effect? Surely it would not seem to be such, if notes or papers were given back to testatrix, "for her protection." Such a transaction, it seems to me, would evidence a loan rather than a gift. If the gift was consummated after the papers or notes were destroyed in 1893, then petitioner's letter to his mother, in which he says, "Aunt Mary has done nothing for me since 1892," would not be true. What effect shall be given here to the paper Exhibit 3? This paper is dated November 20, 1893, and recites that "all money given to Wm. E. Taber during my life I give to him independent, and with no reference whatever to what I may leave him in my will." This paper, with the exception of the signature of testatrix, is admitted to be in the handwriting of the petitioner. It refers to no specific amounts, but says, "all moneys given, etc." What did she refer to by the word "given"? Did it have reference to the money for which notes had been given and destroyed, and upon which interest was then being paid, by way of furnishing board, etc., or to other sums or amounts? Was it the intelligent act of a person who understood what she was signing? There is no evidence of what took place, or what led up to the signing of this paper. It was drawn by the person who had been the adviser in business matters, and who held, to a certain extent, confidential relations with testatrix. She

was a woman feeble in health, and nearly 84 years of age. Her will was made and dated in March following, and no mention is made in the will of any gift of money to petitioner, except the $2,500. It would seem that, if she understood that she had let him have other sums by way of gift, it would have been most natural to have made mention of it in her will. It also appears that the assignment of the two mortgages, aggregating $1,200, wherein it is recited in the instrument of assignment that petitioner paid the consideration of $1,200, is the same amount and transaction wherein petitioner says $1,200 was given him by testatrix.

Counsel for petitioner makes the point that "the inventory is prima facie evidence upon the accounting, both as to the extent and value of the property with which the executor is to be charged, and the burden is upon the contestants of showing that anything was omitted therefrom, or that the executor is chargeable with anything more, "and cites numerous cases in support of that proposition. This rule is undoubtedly correct, but when it appears that funds of the estate have passed into the possession of the accounting party, and are not included in the inventory, the burden is then shifted, and cast upon him to show a legal and sufficient reason for withholding the same therefrom.

The executor also raises the question of the statute of limitations against all claims made by contestants. There seems to be no force in this point. If this was a case where the statute of limitations would apply, then there was no gift; and, if the transaction was a loan, then the payment of interest, by way of furnishing board, etc., would operate to prevent the running of the statute.

The gift sought to be established here is a gift inter vivos, and is to be governed by the rules relating to that species of gift instead of those relating to gifts causa mortis. The chief difference between the two is that a completed gift inter vivos is irrevocable, while a gift causa mortis may be revoked by the donor, and is revoked by the recovery of the donor from the sickness during which the gift was made.

In Rix v. Hunt, 16 App. Div. 540, 44 N. Y. Supp. 988, Adams, J., writing for the court, says (at page 545, 16 App. Div., and page 992, 44 N. Y. Supp.):

"The gift being one inter vivos, there must be present five distinct elements in order to invest it with the quality of validity. These elements are—First, that the donor must be competent to contract; second, there must be freedom of will; third, the gift must be complete, with nothing left undone; fourth, the property must be delivered by the donor and accepted by the donee; and, fifth, the gift must go into immediate and absolute effect."

—And citing Deposit Co. v. Huntington, 89 Hun, 465, 469, 35 N. Y. Supp. 390.

Delivery of the property in question with the intention to give is absolutely necessary to the validity of the gift. The owner must part with his dominion and control of the thing before the gift can take effect. The circumstances must be such that a present gift is intended. A gift to take effect at a future time is void, etc. 8 Am. & Eng. Enc. Law, 1313 et seq.; Gannon v. McGuire, 22 App. Div. 43,

47 N. Y. Supp. 870.   This statement of what is essential to constitute a gift is recognized and enforced by two of the leading cases in this state (Young v. Young, 80 N. Y. 430, and Beaver v. Beaver, 117 N. Y. 428, 22 N. E. 940).   Also, in the case of Ridden v. Thrall, 125 N. Y., at page 579, 26 N. E. 629, 11 L. R. A. 688, Earl, J., says:

"To consummate a gift, whether inter vivos or causa mortis, the property must be actually delivered, and the donor must surrender the possession and dominion thereof to the donee."

And in the late case of Gannon v. McGuire, decided in October, 1899, in the court of appeals, and reported in 160 N. Y., at page 481, 55 N. E. 8, it is held:

"The essential element of a gift inter vivos is delivery by the donor of the subject of the gift with intent to at once vest title thereto in the donee.   Mere words of gift are not enough, for the owner must part with possession and control before the gift can take effect.   There must be an intent to make the gift in præsenti, because a gift to take effect in futuro is void as a promise without consideration."

The decisions of our courts have also established rules for our guidance as to the nature and quality of evidence necessary to establish gifts in certain cases, and under different circumstances, some of which will be noticed here.   It will be noticed that the only evidence in this case, that the testatrix ever stated to any one that she had given anything to the petitioner, was that given by Mary J. Taber, his wife; and there is no evidence in the case that the petitioner ever claimed or stated to any one, or asserted, that the testatrix had given him these sums, amounting to $4,400, until after her death.   It seems to me that the relations of the parties in this case were such as to require the strongest proof.   "In cases where confidential relations exist between the parties, the person obtaining the benefit must show by the clearest evidence that the gift was freely and deliberately made. The burden is upon the person taking the gift to show that the transaction was fair and honest."   Case v. Case, 49 Hun, 83, 1 N. Y. Supp. 714; Sears v. Shafer, 6 N. Y. 268; Ford v. Harrington, 16 N. Y. 285; Barnard v. Gantz, 140 N. Y. 249, 35 N. E. 430, and cases cited.

In the case of Rix v. Hunt, 16 App. Div. 545, 44 N. Y. Supp. 992, it is said:

"In cases of this nature, where claims are presented against a deceased party, it is unquestionably settled, by repeated adjudications, that the same should be scrutinized with even more than ordinary care, in order to prevent, as far as possible, the allowance of unjust and fictitious demands against parties whose mouths are sealed by death."

In Re Manhardt, 17 App. Div. 1, 44 N. Y. Supp. 836, the court (Follett, J., at pages 10, 11, 17 App. Div., and page 841, 44 N. Y. Supp.) says:

"The appellant asserts that the relations existing between Margaret Seitz and himself were of a confidential nature, and thus he brings himself within the rule that when such relations exist between an alleged donor and donee, and the latter, after the death of the former, claims title to the estate, or to part of it, by a gift, it must be established by evidence which is clear, strong, satisfactory, and convincing.   In such cases the law 'does not so much consider the bearing or hardship of its doctrine upon particular cases, as it does the importance of preventing a general public mischief, which may be brought about by means secret and inaccessible to judicial scrutiny, from the danger

ous influences arising from the confidential relation of the parties.' Story, Eq. Jur. § 310; Case v. Case, 49 Hun, 83, 1 N. Y. Supp. 714. The rule in such cases is that the gift must be established by evidence possessing the highest degree of probative force. All the authorities agree in this, though the rule is expressed in various forms [citing numerous cases]."

In Grymes v. Hone, 49 N. Y. 17, it was said:

"As there is great danger of fraud in this sort of gift, courts cannot be too cautious in requiring clear proof of the transaction. This has been the rule from the early days of the civil law (which required five witnesses to such a gift) down to the present time."

In Ridden v. Thrall, 125 N. Y. 572, 26 N. E. 627, 11 L. R. A. 684, it was said:

"Such a gift should be proved by very plain and satisfactory evidence, and, if the case depended upon the evidence of the wife alone, any court might well hesitate to uphold the gift."

In Farian v. Wiegel, 76 Hun, 462, 28 N. Y. Supp. 95, the court refused to sustain an alleged gift which was attempted to be established by the uncorroborated evidence of the wife of the alleged donee. "A sound policy requires that the rules which the courts have adopted for the protection of the estates of decedents from depletion by alleged donees should not be relaxed." Bliss v. Fosdick, 86 Hun, 162, 33 N. Y. Supp. 317, affirmed in 151 N. Y. 625, 45 N. E. 1131. "These rules should be rigorously applied, in case a gift inter vivos is asserted for the first time after the death of the decedent." See, also, to the same effect, In re O'Connell, 33 App. Div. 483, 53 N. Y. Supp. 748.

Applying the rules of law laid down in the foregoing authorities to the evidence in this case, I am clearly of the opinion that it falls far short of establishing a gift of these three sums, amounting to $4,400, to the petitioner by the testatrix, Mary Taber, in her lifetime. If I am right in these views, it follows that these three sums, amounting in the aggregate to $4,400, were the property of the said Mary Taber at the time of her death, and should have been included in the inventory by the petitioner as the property and assets of her estate, and because of his failure to do so his account now filed for settlement should be surcharged to that extent and with that amount. Findings may be prepared and submitted for signature in accordance with the views expressed in this opinion. Decreed accordingly, with costs of this proceeding to contestants, payable out of the estate.

Decreed accordingly, with costs.