MARY C. KELLY, Plaintiff, *v.* JOSEPH A. KELLY, Defendant.

(Supreme Court, Bronx Special Term, July, 1921.)

Deeds — acknowledgment — presumption of due execution — evidence — fiduciary benefiting by transaction must show the fairness of the transaction, lack of fraud, mistake and undue influence — when equity will act under the doctrine of constructive fraud — burden of proof necessary to show past consideration.

The certificate of a notary public to the acknowledgment of a deed raises a presumption of a due execution of the instrument and his certificate may be overthrown only upon proof so clear and convincing as to amount to a moral certainty.

Where the testimony of a witness who was present at the execution of the deed of conveyance and of the notary public who took the acknowledgment, that the grantor, though both physically and mentally weak, having had several strokes of paralysis, was able to be up and around the house at or about the time the deed was executed, is in a measure corroborated by the testimony of a specialist in nervous and mental diseases who had known the grantor and family for fifteen years and within two and one-half years after executing said deed, the grantor, in complete forgetfulness of that transaction, signed a contract for the sale of the same property to a relative of hers by marriage, her testimony that she never signed and acknowledged the deed in the presence of the notary public and the other witness but signed it in the presence of the grantee, one of her brothers, is not entitled to any credence whatever.

Where though in an action to set aside the deed as fraudulent and void there was a failure of proof of an allegation that defendant falsely represented to plaintiff that she was largely indebted to him and that if she did not execute and deliver said deed to him he would put her out of the house and compel her to pay him large sums of money due him for money claimed to have been expended on behalf of and for the benefit of plaintiff, prior to the execution of the deed, it does not follow that plaintiff is not entitled to any equitable relief and her complaint should not be dismissed.

Where, therefore, apart from the presumption of fiduciary or confidental relationship as applied to the relation of brother and sister, the evidence shows that at the time the deed was signed and acknowledged the defendant occupied a close and confidential or fiduciary relation toward the plaintiff and had the management and direction of her affairs; that she reposed great confidence in him; that the plaintiff was in a dependent condition in relation to the defendant; that the plaintiff's mind was greatly weakened from illness and anxiety; that the defendant was in good health, robust in physique and possessing a strong and overmastering will and that the plaintiff acted in the transaction without having had the benefit of competent disinterested advice, the case comes fairly within the equitable rule which casts upon the party who was benefited by the transaction the burden of showing the integrity and fairness of the transaction, that it was fully understood and that there was no fraud, mistake or undue influence.

In such case, without proof of actual or positive fraud, equity will grant relief under the doctrine of constructive fraud.

That defendant was not present when the deed was signed, was not sufficient to show that the influence of the confidential relationship which existed between the parties did not subsist and operate upon the mind of plaintiff when she executed the deed.

Defendant made no claim that the transfer was founded upon any other consideration than "one dollar and other valuable considerations," as pleaded in the answer, and one part of the consideration was based upon defendant's support of plaintiff for fifteen years prior to the execution of the deed, and his oral promise to support her for the remainder of her natural life. The evidence upon the issue of past support was conflicting, and no evidence was offered as to the value of the property at the time the deed was executed. *Held,* that while a past consideration is sufficient to support a deed, the defendant had not sustained the burden of proof with respect to whether there was a past consideration for the transfer.

Defendant's agreement to continue to support the plaintiff not being in writing, and not even referred to in the deed, and he having used none of the usual methods devised to protect the rights and interests of such a grantor, and having in violation of the duty he owed to plaintiff taken the absolute title to the property without giving any security for her future support, the transaction was manifestly unfair and greatly to the detriment of plaintiff, and judgment is directed in her favor as indicated in the opinion herein.

ACTION to have a certain deed of conveyance adjudged fraudulent and void.

Francis X. Kelly (Peter C. Kelly, of counsel), for plaintiff.

Joseph V. McKee, for defendant.

GIEGERICH, J. The action is to have a certain deed bearing date the 30th day of January, 1918, purporting to have been executed by the plaintiff to the defendant adjudged fraudulent and void. The complaint alleges that on or prior to the 30th day of January, 1918, the plaintiff was the owner and in pos-

session of certain real property in the city of New York, county of Bronx, of the value of $11,000, consisting of the three-story and basement frame dwelling and appurtenances, known as No. 3544 Park avenue, in the borough of The Bronx, city of New York; that on or about the said day it is purported the plaintiff made, executed and delivered to the defendant a deed of conveyance of said property, which deed was recorded by the defendant on February 20, 1920, in the office of the clerk of the county of Bronx, in liber 260 of conveyances, page 122, section 9. The allegation that the deed was recorded in the clerk's office of Bronx county is evidently an error, as the deed shows that it was recorded in the register's office of that county. The complaint further alleges that at the time of the purported giving of the said deed to the defendant the plaintiff was a single woman, advanced in years, suffering from several strokes of paralysis, in feeble health and both physically and mentally weak, which condition, it is alleged, the defendant well knew. The complaint then alleges "that for more than five years prior to the giving of said deed the defendant, the brother of this plaintiff, representing himself to be a single man, whereas he was married, having a wife living, as plaintiff is informed and verily believes, occupied a room and obtained board from this plaintiff. This plaintiff, relying upon the statement made by the defendant, maintained for the use of both herself and the defendant the building aforesaid, consisting of about thirteen (13) rooms and appurtenances, until plaintiff received the first stroke of paralysis, which she is informed and believes has crippled her for life; that while plaintiff was in such feeble health and weak, and susceptible to be easily influenced and frightened, defendant, intending to take advantage of plaintiff's condition and of the con-

fidential relations existing between them to get possession of the property, falsely represented to plaintiff that she was largely indebted to him and that if she did not make, execute and deliver said deed to him he, the defendant, would compel plaintiff to pay him large sums of money due him, whereas, in fact, as defendant well knew, plaintiff was not indebted to him in any amount, but, on the contrary, defendant was at that time largely indebted to plaintiff for moneys collected by him and not accounted for; that defendant thereby unduly influenced and coerced and frightened plaintiff in her then enfeebled condition to execute and deliver said deed without any consideration whatever being paid by defendant.'' The complaint then further alleges that since the making and delivery of said deed the defendant has had partial possession of the aforesaid premises and appurtenances and profits thereof. The prayer for relief is that the aforesaid deed of conveyance of the said land be adjudged to be fraudulent and void; that it be directed to be surrendered and canceled and that the record thereof be canceled; that the plaintiff be adjudged to be owner of the said premises in fee; that the defendant be required to account to the plaintiff for the rents and profits received by him from said lands and that the plaintiff may have such other and further relief as may be just, with the costs of this action. The answer denies all the allegations of the complaint except that the plaintiff was the owner of the premises in question, and that the plaintiff executed and delivered a deed of such premises to him. The answer, for a further and distinct defense, alleges that the plaintiff executed a deed to him, being the one dated January 30, 1918, and recorded, as above mentioned, in consideration of the defendant having supported the plaintiff for a great number of years, and upon the

defendant's promise to continue to maintain and support her, and that the defendant ever since the execution of the said deed has continued to support and maintain the plaintiff and intends to and is willing to support her. It appears from the evidence that the plaintiff is a single woman, fifty-seven years of age; that the defendant is forty-nine years of age and is and for ten years last past has been a lieutenant in the fire department of the city of New York; that at the present time he receives a salary of $3,200 per annum, and, so far as the evidence discloses, has never been married and has lived in the house in question for thirty-three years; that the plaintiff has three brothers besides the defendant, one of whom, Peter C. Kelly, is a lawyer, and who appeared as the plaintiff's counsel at the trial of this case, and with whom the plaintiff has been living since on or about January 10, 1921. The evidence further shows that the plaintiff's mother died in 1905 and that her father died in or about the year 1906; that the plaintiff at the time of the alleged execution of the deed in suit had no property, real or personal, except the real property which is the subject of this controversy; that the property in question was conveyed to the plaintiff by her mother and that after the death of the latter Thomas J. Kelly, a brother of the plaintiff and an inspector in the bureau of buildings in the borough of Brooklyn, brought a suit against the plaintiff to set aside such deed of conveyance, but was unsuccessful. It further appears from the evidence that the real property in suit was at the time of the alleged execution of the deed of conveyance thereof to the defendant incumbered by a mortgage for $3,500, which was executed by the plaintiff and bears date the seventh day of February, 1916, and that a prior mortgage for $2,500, executed by the plaintiff and dated February 7, 1911,

was canceled of record. It appears, furthermore, from the evidence that since the death of the father and until shortly before the trial of this action the defendant boarded with the plaintiff and that, with the exception of the top floor, which was let to a tenant, the plaintiff and the defendant lived alone in the dwelling house in question; that adjacent to such dwelling house, upon the same land, there is a two-story stable, which is under lease to a tenant and that at the time of the execution of the deed in suit the combined rent of the stable and the apartment on the top floor was $41 per month. The evidence shows that on March 12, 1917, the plaintiff suffered a stroke of paralysis while living upon the premises in suit. Dr. John F. Holmes, a witness, called by the plaintiff, testified that he has been a physician and surgeon since 1876 and that he treated her from March 12, 1917, until May 5th of the same year; that his diagnosis was cerebral hemorrhage; that the paralysis was what is known as hemiplegia, which means paralysis of one side of the body; that the paralysis resulted in a paralysis of the right side due to a hemorrhage on the left side of the brain; that when he first saw the plaintiff she was unconscious and there was no motion whatever of the limbs of the right side of the body; that she was in a " stuporous condition " and so remained for about a week and then began gradually to improve and became clearer mentally, but she had not when he ceased treating her regained her power of motion; that she was in bed the greater part of the time, " but able to get up a little, sit up; " that her mental power as well as her power of speech were then much impaired and that her faculty of sight was also impaired. Dr. Holmes further testified that he has treated a considerable number of cases of paralysis; that this was a severe case of paralysis; that

about one-half of the brain was impaired; that the impairment generally results in another stroke; that between the initial and next stroke there is a " general clearing up," but never complete; that in the interval between the first and last visit there was considerable " clearing up; " that at times the plaintiff seemed to understand the nature of her acts, but that when he ceased to treat her she had not fully recovered and that there was still an impairment of the faculties. On cross-examination Dr. Holmes testified, among other things, as follows: " Q. Now, doctor, suppose you take a woman, who has received a stroke of paralysis, then has received a secondary stroke, what is her condition; what would her condition be after the second stroke, her mental condition? A. I should think her mental condition would be decidedly impaired. Q. And that impairment would go principally to the brain areas affected; isn't that right, doctor? A. Yes. Q. With the resulting impairment of the brain faculties? A. Yes, sir." Doctor William E. Young, a specialist in nervous and mental diseases, was also called as a witness by the plaintiff. He testified that he knew the plaintiff and family probably fifteen years; that he was unable to state what month it was in the year 1917 that he was first called in attendance upon the plaintiff, and that he saw her on and off from that time until along in the spring of 1920; that the plaintiff had a severe apoplectic stroke, but the doctor was unable to state whether it was her first or second stroke; that when he was first called in attendance the plaintiff was, like everybody that had a stroke, unconscious at times and did not know what she was doing; that she had lost control of the muscles on the right side of her body; that her speech was incoherent at times; that her pupils were for a time dilated; that she could not walk very well and that there were blood clots on

the brain; that in the early stages the plaintiff's mental condition was very poor; that a couple of months after he first saw her she was able to get about the house and that when he ceased to visit the plaintiff her mental condition was fair and she apparently comprehended the nature of her acts. He further testified that a person suffering from a stroke of paralysis might sometimes comprehend the nature and extent of his acts, but that he is weaker mentally after the first stroke; that a person suffering from paralysis or apoplectic condition was more subject to fear, intimidation, threats and the like than a person in good health; that the after effect of a stroke is a general impairment; that as a rule the improvement, if any, is gradual; that "if you chase a person that has apoplexy around the block you will have him throw another stroke;" that patients who have had a stroke of paralysis are in a highly nervous condition, but the clearer the mind the less they are liable to be influenced, provided the mind is clear enough at the time to be influenced; that there was no hard and fast rule for apoplexy; "in some cases some get quite clear; others will have a slight paralysis; others will have a secondary attack and more paralysis." He admitted having stated to the plaintiff's counsel shortly before the trial that "about apoplexy it was generally conceded that apoplectics were not in full mental control." He testified, however, that he has not changed such opinion at all since he had a conversation with the defendant. Dr. Young further testified that he did not recall the exact time of the stroke, but he recalled that he received a present of an automobile in December, 1917, about Christmas, and that he drove to the plaintiff's house right after he received the car and that she had "an infected hand, something of that kind," and had some paralysis of the right side at

the time; that he called several times after that, but could not state the exact number of times nor for how long a period of time he treated the plaintiff; that when he saw her she was able to get around the house, slightly excitable, but he otherwise did not pay much attention to her condition; that she prepared different things for him and went to the ice box and brought something for him to eat. On cross-examination this witness was asked the following questions and made the following answers: "Q. Were you visiting at their house during January, 1918? A. I think so. Q. During the latter part of the month, too? A. Well, I don't know whether the — it was along the first of the month. Q. Do you recall whether the plaintiff was up and around the house during that time, the latter part of January? A. I don't know how late in the month of January I was at the house, but I remember along about the first of January, and probably for about a week or two weeks afterward, during the time she had an infected hand. Q. She was all around then? A. She was about then. Q. She was in control of her senses as far as you could see by her apparent acts? A. She waited on me at the time." On redirect examination he was asked: "Have you any record or report to indicate that you were present at the home of the plaintiff in the month of January, 1918?" He answered: "I have no reports nor records at all in this case." Dr. Peter Thomas Daly, another physician who treated the plaintiff, was also called as a witness on her behalf. He testified that he has been a practicing physician since 1910; that he first saw the plaintiff in April, 1920, and was given a history of the plaintiff having had a stroke about three years previous and that she then had signs of paralysis in her right arm, right leg and defective speech; that when he saw her in April her mental condition was pretty

good; that he has seen the plaintiff in all four times, the last visit having been made about three or three and one-half weeks previous to the trial; that at the time he called to see the plaintiff there was a complete paralysis of the right side, but she had some motion of the right arm and leg; that her eyesight was good; that her blood pressure at first was 220; some months later it was 185; about three months " later than that " it was 165 and about two or three weeks previous to the trial it was 158, practically normal, and that it was probably an old condition when he saw her. On his cross-examination Dr. Daly further testified that he could not tell from the plaintiff's condition whether there had been a second stroke of paralysis; that all he knew from the diagnosis was that she had received a stroke of paralysis; that at the time he treated her she was in a pretty good mental condition, and that outside of the right side she was in a fairly good condition. This witness in his redirect examinaton testified as follows: " Q. Did you examine the plaintiff to-day, doctor? A. I did. Q. Will you state what you observed? A. Why, her mental condition seems very good, and I think her speech has improved since I had seen her in April. From April, 1920, to the present time I think her speech has improved; her mental condition seems good." It appears from the evidence that since January, 1918, when she signed the deed, the plaintiff has suffered at least three additional strokes of paralysis, but none of the witnesses who gave testimony with respect thereto were able to state definitely when they took place. As seen from the testimony of the physicians who treated the plaintiff since the first stroke of paralysis they could not tell from her condition whether she had a second stroke of paralysis. Except as above stated, it was not shown whether any physician treated the plaintiff for

the subsequent strokes. If any did treat her he was not called as a witness. The defendant did not call any medical witness. The stenographer's minutes of the testimony of the witnesses other than the physicians have not been furnished, but if my memory serves me right the plaintiff testified that on or about January 30, 1918, she was in bed at her house suffering from paralysis and that while in that condition the defendant came to her bedside in the morning with a book, paper, pen and ink and stated to her that she was largely indebted to him, that he needed the money, as he was in debt, and that if she did not sign the paper which he presented to her for her signature he would put her out of the house; that she was afraid that if she did not sign the paper he would carry out his threat and that, intimidated by the threat so made, she signed the paper on a book without any one being present, and that she would not have signed the paper but for such threat, and which paper, she believes, was an acknowledgment of a debt claimed to be due from her to the defendant. The plaintiff further testified that she was not indebted to the defendant, but that he was indebted to her; that she did not read the paper because she had broken her reading glasses some time previously and could not read without them; that she did not receive any consideration for signing the paper; that she did not receive any legal advice as to the nature of the paper she so signed; that she first learned that the paper which she signed was a deed of conveyance of the property after she had signed a contract for the sale of the property in September, 1920; that when she signed the paper she had been ill for about six months and that, with the exception of the tenant and his family on the top floor, no one but the defendant and herself lived in the house at the time when such paper was signed. The defend-

ant denied that he made any representations or threats whatever to the plaintiff to induce her to sign the deed. He testified that he was not present when the deed was signed; that in the early part of January, 1918, the plaintiff stated to him that " she wanted to deed the property to him " because he had supported her, and that he stated to her that he would support her while she lived; that he requested Mr. Francis X. Kelly, the lawyer, who is now and ever since the commencement of this action has been, the attorney of record for the plaintiff therein, to draw the deed, and that Mr. Kelly stated to him that he was too busy with other matters to do so. The defendant further testified that he had the deed prepared by a lawyer whose office was in a tall building in the vicinity of Fulton street and near a cemetery; that the lawyer was a stranger to him and that he does not remember his name or address. The deed from the plaintiff to the defendant was recorded on February 20, 1920, more than two years after its alleged execution. The defendant testified that he did not have the deed recorded until he was requested to do so by the plaintiff. The latter denies having made such a request. The defendant admitted on cross-examination that after the alleged execution of the deed, but before it was recorded, he had the payment of the mortgage extended in the name of the plaintiff; that he did not notify the mortgagee that he was the owner of the property because he did not believe he was the owner thereof until the deed was recorded and that he did not know what an extension of a mortgage was. The defendant conveyed the property in suit to his brother, Thomas J. Kelly, by deed dated January 11, 1921, and recorded January 12, 1921, after the filing of notice of *lis pendens* in this action. The defendant testified that such conveyance was made at the request of the

plaintiff, which she denies. The defendant's testimony that he was not present when the deed was signed by the plaintiff is corroborated by the testimony of Mr. H. Paul Weber and Miss Margaret V. Krug. The former testified that he was a pharmacist, now in the employ of L. K. Liggit & Co., at No. 740 Lexington avenue, borough of Manhattan, New York city, and that he resides at No. 2789 Valentine avenue, in the borough of The Bronx; that on January 30, 1918, he was the owner of the drug store which was then conducted at No. 431 East One Hundred and Sixty-ninth street, borough of The Bronx, and a notary public; that on the day last mentioned he received a request over the telephone to call at the plaintiff's home, but he had no recollection who called him; that he went to the plaintiff's residence, the street door to which was opened by the plaintiff; that the plaintiff requested him to get a certain named lady, whose name the notary did not recall, and who then resided in the vicinity of the plaintiff's home and whom the plaintiff stated she wished to act as a witness, and that he returned to the plaintiff's residence with her; that he had no previous acquaintance with such lady, whom he identified on the trial as the one who was present on this occasion and whose name is Margaret V. Krug; that the plaintiff then and there stated to Miss Krug and himself that she had read the paper, which was in her possession, and that she understood it, and that she signed such paper in their presence, and at her request Miss Krug signed her name on the deed as a subscribing witness and that the plaintiff acknowledged the execution of such paper before the witness, who after inserting the date, signed the certificate of acknowledgment in her presence and in the presence of Miss Krug. The notary further testified that the plaintiff was not in bed; that she was fully dressed and that she

walked slow, as if she had been sick; that he had no conversation with the plaintiff except as above mentioned; that she furnished the pen and ink which were used on that occasion; that he had a fountain pen; that no one else but Miss Krug and himself were present when the deed was executed and acknowledged, and that he kept a record of acknowledgments of instruments taken and oaths administered by him, but that he had destroyed the same because he had no further use for it and that such destruction took place at a period long before he knew that he would be called as a witness in this case. On cross-examination the notary further testified, among other things, that the plaintiff's condition was then better than it was at the trial; that the defendant was not present at any time while he was at the plaintiff's home; that he did not read the contents of the paper which was signed by the plaintiff; that the plaintiff was a patron of his store; that he did not know the defendant; that the plaintiff spoke very distinctly and that she paid his fee, amounting to fifty cents. Miss Krug testified that she now resides in Cress Kill, N. J.; that on January 30, 1918, she resided at No. 3552 Park avenue, in the borough of The Bronx, three doors, as she testified, from the plaintiff's residence; that some time in January, 1918, she signed a paper at the plaintiff's residence; that at about eleven o'clock in the forenoon the defendant called at her residence and stated that his sister, the plaintiff, wanted to see her; that she called on the plaintiff at her residence and was informed by her that she desired the witness to sign a paper and that she would have her called as soon as she was needed; that about noon Mr. Weber, the notary, called for her and she accompanied him to the plaintiff's residence; that the plaintiff opened the door and they accompanied her to the dining room and the plaintiff

14

procured a pen and ink; that the plaintiff then stated that the paper which she had in her possession was all right and that the Joseph Kelly named therein was her brother; that the plaintiff signed such paper in the presence of the notary and herself; that the witness signed the paper as a subscribing witness in the plaintiff's presence at her request and acknowledged to the notary the execution by her of such paper; that the plaintiff paid the notary's fee of fifty cents, which she stated was very reasonable; that the plaintiff was not in bed, but up and around the house and was washing French windows when she and the notary arrived at the plaintiff's house; that the witness was acquainted with the plaintiff's physical condition at the time and that it was getting worse all the time. On cross-examination this witness further testified that the paper was signed on a table in the centre of the dining room, which was located on the first floor of the house; that she did not recollect the date when such paper was signed, but she was certain that it was in the winter of 1918, when there was snow and slush upon the ground; that she knew the plaintiff about eleven or twelve years; that the plaintiff had her reading glasses on, and that the witness did not read the paper which was signed by the plaintiff. In rebuttal of the foregoing testimony the plaintiff testified that neither Miss Krug nor Mr. Weber, the notary, was at her home at the time they claim they were there; that she did not sign the deed in their presence, but that it was signed by her when no one but the defendant was present; that she did not leave any message at Mr. Weber's drug store or send word to any one for him to call upon her; that at the time in question there was no telephone in her house and that she had been in Mr. Weber's drug store, but never saw him there and was not acquainted with him. In the consideration of the

evidence relating to the alleged taking and certification of the acknowledgment of the deed in suit, it is to be presumed at the outset that the certificate of the notary is true. *Albany Co. Sav. Bank* v. *McCarthy,* 149 N. Y. 71; *Marden* v. *Dorthy, No. 1,* 12 App. Div. 176. The certificate of acknowledgment raises a presumption of a due execution of the instrument, which must be weighed against any evidence given to show that it was not duly executed. *Uvalde Paving Co.* v. *City of N. Y.,* 99 App. Div. 327. Such certificate will not be overthrown, however, upon evidence of a doubtful character, such as the unsupported testimony of interested witnesses or upon a bare preponderance of evidence, but only on proof so clear and convincing as to amount to a moral certainty. *Albany Co. Sav. Bank* v. *McCarthy, supra; Austen* v. *Richardson,* 67 App. Div. 166; *Frank* v. *Schloss,* 37 Misc. Rep. 140; *Bennett* v. *Edgar,* 46 id. 231; *Hallohan* v. *Rempe,* 66 id. 27. As already stated, the notary gave evidence in support of his certificate. So far as I can ascertain from the evidence it would seem that he is a wholly disinterested witness. This applies equally to the testimony of Miss Krug, the young lady who was present when the deed was signed and acknowledged. These witnesses, so far as concerns the physical condition of the plaintiff and her ability to be up and around the house at or about the time it is claimed the deed was signed and acknowledged by her, are in a measure corroborated by the testimony of Dr. Young. The testimony of the plaintiff that she never signed the deed in the presence of the notary and Miss Krug, or acknowledged to them the execution thereof, is not supported by any facts or circumstances in the case. Moreover, it appears from the testimony of witnesses, other than the physicians, that since the alleged execution and acknowledgment

Supreme Court, July, 1921.    [Vol. 116.

by the plaintiff of the deed that she has suffered at least three additional strokes of paralysis. The appearance of the plaintiff on the stand and the manner in which she gave her testimony, coupled with the facts and circumstances of the case, have strongly impressed me with the conviction that her mind has become greatly enfeebled by reason of illness and anxiety and that it has been impaired to such an extent that transactions with respect to the property, including the circumstances connected with the signing and acknowledgment of the deed from her to the defendant, have completely faded from her mind. While she answered questions put to her at the trial with some degree of intelligence, notwithstanding her impaired speech, the evidence nevertheless shows that in some transactions she remembered having had since the alleged signing and acknowledgment of the deed (such, for instance, as the signing of the contract for the sale of the property in September, 1920, and of a letter to her attorney dated January 8, 1921, instructing him to " dismiss " all legal actions in her name against the defendant, and her apparent acquiescence in the transfer of the property from the defendant to their brother, Thomas J. Kelly, in January, 1921), she acted not only contrary to her interests, but that her mental condition was such that she was unable to fully understand such transactions or to appreciate the character of the papers signed by her. It thus appears that the plaintiff did not possess sufficient mental power to exercise a deliberate judgment in certain transactions which she was able to recall and that owing to the feebleness of her mind she has forgotten that she signed and acknowledged the deed in suit after the lapse of three years. If credence be given to the testimony of the notary and Miss Krug that the plaintiff stated to them that she had read and

understood the paper before she signed the same, the plaintiff must have seen from a reading thereof that a conveyance of her property to the defendant was made thereby, although she did not fully understand the technical language of the instrument or its full legal effect. That the plaintiff has some familiarity with the form of an ordinary deed of conveyance appears from her own testimony, that six months after she signed the deed in suit at the time claimed by her she, in the presence of Miss Krug, signed and acknowledged a paper in the office of one Brown, a notary public, which, it is claimed, she took home with her, and after getting her reading glasses and seating herself near the window she read such paper, and upon discovering that it was a transfer of her property to the defendant she placed the same in the coal stove and put a match to the paper and burnt it up. So important a circumstance, therefore, as a prior conveyance of her property to the defendant by the deed in suit, especially where, as here, it was all the property she owned, would naturally be impressed upon her memory. It would seem, however, that within about two and one-half years after the signing and acknowledgment of the deed in suit that the plaintiff, in complete forgetfulness of such conveyance, signed a contract for the sale of the property. The words of the opinion of the court in *Haydock* v. *Haydock*, 34 N. J. Eq. (7 Stewart) 570, 577; 38 Am. Rep. 385, 386, are peculiarly applicable to this situation. It was there said: "A person who is oblivious of a former disposition of his property is as unfit to make a subsequent disposition thereof as if he was under an insane delusion as to its extent and character." The testimony of such a witness is not under these circumstances entitled to any credence whatever. On the other hand, the positive testimony of the notary and

of Miss Krug is corroborated by all the attendant circumstances and should therefore be believed. It should be remembered that it was the duty of the notary in making the certificate of acknowledgment to ascertain, under the responsibility of his oath of office, the truth of the matters in relation to which he certified, and the legal presumption is that he did his duty. If he willfully certified falsely he is guilty of a felony. *Albany Co. Sav. Bank* v. *McCarthy, supra,* 82. The presumption is against the commission of a crime and the deliberate violation of a public duty, and that presumption is confirmed in the present case by the positive testimony of the notary and the subscribing witness to the deed. Their testimony ought not, therefore, to be deemed to have been overcome by the mere denial of the plaintiff that she signed and acknowledged the deed in their presence. *Marden* v. *Dorthy, supra,* 185. I have therefore no hesitation in finding that the plaintiff signed and acknowledged the deed in suit in the presence of the notary and Miss Krug at the time stated in the notary's certificate. It necessarily follows from the foregoing conclusion that such deed was not signed by the plaintiff in the presence of the defendant, as she claims it was. This leads to the consideration of the question whether the plaintiff was influenced, coerced or frightened into executing such deed by the alleged representation that she was largely indebted to him and by his alleged threat that if she did not sign it he would put her out of the house. The evidence satisfies me that the defendant did not make any such false representation or threat in order to induce her to execute and acknowledge the deed in suit. It by no means follows, however, that because the issues with respect to the question whether or not the execution of the deed in suit was procured by the alleged fraudulent repre-

sentation and threat of the defendant have been decided in his favor that the plaintiff is not entitled to any equitable relief. I, therefore, do not agree with the contention of the defendant's counsel that the complaint should be dismissed because, as claimed, the plaintiff has failed to prove that part of the complaint wherein it is alleged that the defendant "falsely represented to plaintiff that she was largely indebted to him, and that if she did not make, execute and deliver said deed to him he, the defendant, would compel the plaintiff to pay him large sums of money due him." The case of *Absalon* v. *Sickinger*, 102 App. Div. 383, relied on by the defendant, has not the slightest application to this case for the reason that there the complaint neither alleged nor was there any evidence adduced which tended to show that there were any confidential relations between the parties or that the plaintiff was in any sense dependent upon the defendant. But in the present case the situation is entirely different, the complaint being so broad that it is either alleged, or may be fairly inferred from its allegations, that the defendant stood in a confidential relation to the plaintiff and that the latter was in a state of dependency upon the former; that the transaction complained of arose out of such relation, which resulted in an unfair or inequitable advantage to the defendant; that the signature of the plaintiff to the instrument sought to be canceled and annulled was procured by the defendant while the plaintiff was "suffering from several strokes of paralysis, in feeble health and both physically and mentally weak" and that the defendant took "advantage of such condition and of the confidential relation existing between them to get possession of her property." The defendant makes the further point that, although the complaint may contain allegations other than the one that

the deed was procured by reason of the alleged false representation and threat of the defendant, such other allegations have not been established by the evidence. In support of such contention the argument is advanced that there is no presumption of a fiduciary relationship between brother and sister and that the plaintiff has not shown the existence of any confidential relation between herself and the defendant, and, furthermore, that the plaintiff has not shown any superiority on one side and weakness on the other. In other words, that the plaintiff has not met the requirements of the following rule laid down in *Doheny* v. *Lacy,* 168 N. Y. 213, 222, in order to establish her case, viz.: " While in the relations instanced this rule is generally applied, it is, also, extended to other relations of trust, confidence, or inequality, but its application will then demand some previous proof of the trust and confidence, or of the superiority on one side and of the weakness on the other. The law will not presume it from the ordinary relations between persons, in the business world, or in the family connection. The question as to parties so situated is a question of fact dependent upon the circumstances in each case." This contention is without force. Black in his work on Rescission and Cancellation of Written Instruments (vol. 1, § 46, p. 111), says: " The relation between a brother and sister is normally one of such trust and confidence that they are required to exhibit the utmost good faith in any business transaction between them, and each is entitled to rely upon the statements and advice of the other, without assuming that attitude of vigilance and distrust which is expected of persons dealing at arms' length." But apart from this presumption of fiduciary or confidential relationship as applied to the relation of brother and sister, the evidence shows that at the time the

deed was signed and acknowledged the defendant occupied a close and confidential or fiduciary relation toward the plaintiff and had the management and direction of her affairs; that she reposed great confidence in him; that the plaintiff was in a dependent condition in relation to the defendant; that the plaintiff's mind was greatly weakened from illness and anxiety; that the defendant was in good health, robust in physique and possessing a strong and overmastering will and that the plaintiff acted in the transaction without having had the benefit of competent disinterested advice. The case, therefore, comes fairly within the equitable rule which casts upon the party who was benefited by the transaction the burden of showing the integrity and fairness of the transaction; that it was fully understood and that there was no fraud, mistake or undue influence. *Barnard* v. *Gantz,* 140 N. Y. 249; *Ten Eyck* v. *Whitbeck,* 156 id. 341; *Hunter* v. *McCammon,* 119 App. Div. 326; *Allen* v. *La Vaud,* 213 N. Y. 322. Equitable relief in this class of cases, without proof of actual or positive fraud, is afforded under the doctrine of what is designated as " constructive fraud." Black in his Rescission of Contracts and Cancellation of Written Instruments (vol. 1, § 22, pp. 44, 45) defines " constructive fraud " as follows: " Constructive fraud, as distinguished from actual fraud, consists of any act or commission which is contrary to legal or equitable duty, or trust or confidence justly reposed, and which is contrary to good conscience and operates to the injury of another. ' By constructive frauds are meant such acts or contracts as, though not originating in any actual or evil design or contrivance to perpetrate a positive fraud or injury upon other persons, are yet, by their tendency to deceive or mislead other persons, or to violate private or public confidence, or to impair or injure the public

interest, deemed equally reprehensible with positive fraud, and are therefore prohibited by law as within the same reason and mischief as contracts done *malo animo.*' ' Constructive fraud consists in any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him, or in any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.' The important distinction lies in the fact that actual fraud involves moral turpitude, dishonest purpose, or furtive intent, while, in the case of constructive fraud, the motive is immaterial, and may even have been consistent with an innocent intention." The doctrine of constructive fraud has been applied to a great variety of contracts and dispositions of property where a confidential relation exists between the parties, and in order to obtain a clear view of the scope of " constructive fraud " and the application and extent of such doctrine as well as the rules of evidence relating thereto, it may be well to refer to a few authorities which are decisive of the questions involved in this case. In *Sears* v. *Shafer,* 6 N. Y. 268, a widow having a reversionary interest in three farms devised by her father to her three brothers generally, without words of limitation or inheritance, was induced by such brothers, upon whom she always relied for advice, a few months before her death and when she was in a very feeble state of health, to release her interest to them without any consideration, the release reciting that the parties believed that the testator intended to devise in fee, but that the terms of the will gave only a life estate, and the release was designed to give effect to such intention. The widow having died, her children filed their

bill to obtain a decree setting aside the release on the ground of fraud and undue influence. There was no evidence of actual fraud, and none that the particular paper — the release — had been procured by undue influence. The Special Term set aside the release (1 Barb. 408); the circumstances relied upon in granting the decree were (1) the enfeebled bodily condition of the sister, she having been afflicted with a fatal malady for years; (2) the relationship of the parties; (3) the fact that the release was prepared at the instigation of one of the brothers, and (4) the want of satisfactory proof that the sister fully understood the nature and effect of the release. Under the latter head stress was laid upon the circumstances: (1) There was no proof that the release was read over in her hearing, and (2) she was unable to read English or even to write her name. The decree was reversed at General Term, but was affirmed by the Court of Appeals. The court of last resort, after stating that the evidence was abundantly sufficient to authorize a court of equity to grant the relief sought by the bill, at page 272 said: "A court of equity interposes its benign jurisdiction to set aside instruments executed between persons standing in the relations of parent and child, guardian and ward, physician and patient, solicitor and client, and in various other relations in which one party is so situated as to exercise a controlling influence over the will and conduct and interests of another. In some cases undue influence will be inferred from the nature of the transaction alone; in others, from the nature of the transaction and the exercise of occasional, or habitual, influence. The following authorities will show the existence of the principle, and the character and degree of influence against which the court will relieve. (*Casborne* v. *Barsham,* 2 Beavan, 75; Hill Trustees, 156, 157, 158,

159, 162; *Dent* v. *Bennet,* 7 Simmons, 539; Story's Eq. Jur. §§ 308–324; *Wood* v. *Downes,* 15 Ves. 120; *Hugwenin* v. *Basely,* 14 id. 273.)'' In *Case* v. *Case,* 49 Hun, 83, the plaintiff, a married woman and the owner of a house and lot, conveyed the same to her brother, the defendant, without any consideration. He subsequently delivered to the husband of the plaintiff a mortgage upon the premises without any consideration. He subsequently executed another mortgage upon the premises to the plaintiff, and thereafter conveyed the premises to the plaintiff's husband. The plaintiff brought an action to set aside the deed executed by the plantiff to the defendant, and also the deed executed by the latter to the plaintiff's husband. It appeared from the evidence that the defendant held, as a brother, close and confidential relations with the plaintiff; that the transaction embraced her entire estate, so that at the age of 60 and upwards she was left penniless, and that while the negotiations were going on between these parties which resulted in the making of this deed the plaintiff was in great distress of mind and anxious to preserve for her support and maintenance the house and lot and keep it from the control of her husband, with whom she did not live. The referee did not find that the defendant was guilty of any fraud or fraudulent representations in his negotiations with the plaintiff for the conveyance of the property, or that the parties acted under any mutual mistake as to any fact or circumstances relative to the subject matter under consideration, and the defendant claimed that, in the absence of intentional fraud, the plaintiff had not shown herself to be entitled to any relief either at law or in equity and that the judgment should be reversed. The court, however, held adversely to this contention in the following language (p. 86): "As the

grantee made no promise in writing to take and hold the property for the use of the plaintiff, and as he was not guilty of any act or mis-statement, which, in the opinion of the referee, amounts to a positive fraud, the judgment must stand, if it is sustained, upon some other view of the case which amounts to a constructive fraud on the part of the grantee, according to well-settled equitable principles, and for that reason the plaintiff was entitled to the relief granted. It was not necessary for the plaintiff to show affirmatively, in order to procure relief, that the defendant acted with a fraudulent intent in procuring the deed. A court of equity will interpose its jurisdiction to set aside instruments between persons occupying relations, in which one party may naturally exercise an influence over the conduct of the other party. (*Boyd* v. *De La Montagnie,* 73 N. Y. 498.) The rule as deduced from a great number of cases in England and in this country is stated by Mr. Story as follows: ' If confidence is reposed, it must be faithfully acted upon and preserved from any intermixture of imposition. If influence is acquired, it must be kept free from the taint of selfish interest and cunning and overreaching bargains. If the means of personal control are given, they must be always restrained to purposes of good faith and personal good. * * * The general principal, which governs in all cases of this sort, is that if a confidence is reposed, and that confidence is abused, courts of equity will grant relief.' (Story's Eq. Jur. sec. 308.) In speaking of the policy of the law on this subject he also says: 'The law, with a wise Providence, not only watches over all the transactions of the parties in this predicament, but it often interposes to declare transactions void, which between other persons would be held unobjectionable. It does not so much consider the bearing or hardship of its doctrine

Supreme Court, July, 1921. [Vol. 116.

upon particular cases, as it does the importance of preventing a general public mischief, which may be brought about by means secret and inaccessible to judicial scrutiny, from the dangerous influences arising from the confidential relation of the parties.' (Story's Eq. Jur. § 310.)'' After reviewing some of the evidence the court at page 87 further said: '' In cases where confidential relations exist between the parties the person obtaining the benefit must show by the clearest evidence that the gift was freely and deliberately made. The burden is upon the person taking the gift to show that the transaction was fair and honest. (*Sears* v. *Shafer,* 6 N. Y. 268; *Ford* v. *Harrington,* 16 id. 285; *Boyd* v. *De La Montagnie, supra.*) This the defendants have signally failed to do.'' The doctrine of '' constructive fraud '' was thus enlarged upon in *Cowee* v. *Cornell,* 75 N. Y. 91, 99: '' We return then to the question whether this case was one of constructive fraud. It may be stated as universally true that fraud vitiates all contracts, but as a general thing it is not presumed but must be proved by the party seeking to relieve himself from an obligation on that ground. Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or on the other from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood. This doctrine is well settled. (Hunt, J., *Nesbit* v.

*Lockman,* 34 N. Y., 167; Story Eq. Juris., § 311; *Sears* v. *Shafer,* 2 Seld. 268; *Huguenin* v. *Basely,* 13 Ves. 105; S. C., 14 id. 273; S. C., 15 id. 180; *Wright* v. *Proud,* 13 id. 138; *Harris* v. *Tremenheere,* 15 id. 40; *Edwards* v. *Myrick,* 2 Hare, 60; *Hunter* v. *Atkins,* 3 My. & K., 113.) And this is I think the extent to which the well-considered cases go, and is the scope of ' constructive fraud.' '' The principle so enunciated has been applied in a large number of cases which are collated in valuable notes to the above case of *Cowee* v. *Cornell* in 7 New York Annotated Digest at pages 1238–1241, both inclusive. The doctrine of '' constructive fraud '' received further illumination in *Weller* v. *Weller,* 44 Hun, 172, 176; affd., 112 N. Y. 655, where the court said: ''A voluntary gift will not necessarily be set aside, because made to a donee standing in a relation of trust and confidence to the giver, but transactions of that nature are viewed by courts of equity with suspicion, and scrutinized with the extremest vigilance. It is not enough that no fraud appears affirmatively, but the presumption is against the propriety of the transaction, and the burden rests upon the party claiming under it to show that it was fair, well understood by the donor and freely entered into by him; and this must appear by evidence in addition to that derived from the execution of the instrument conferring the gift. And usually evidence is required that a third and disinterested person advised the party of all his rights.'' It should be observed that the English cases favor the rule that in every case of a gift or grant between persons occupying a fiduciary or confidential relationship where the advantage is on the side of the one who is the trustee or dominant party to the relationship it must be shown that the donor or grantor

had the benefit of competent disinterested advice before concluding the transaction or else its validity cannot be sustained. *Bridgman* v. *Green,* 2 Ves. Sen. 627; *Huguenin* v. *Basely,* 14 Ves. Jun. 273; *Kempson* v. *Ashbee,* L. R. 10 Ch. 15; *Lyon* v. *Home,* 37 L. J. Ch. 674, 6 English Ruling Cases, 852, 871; *Rhodes* v. *Bate,* L. R. 1 Ch. App. 252. See note to *Huguenin* v. *Basely,* vol. 2, part I, White & Tudor's Leading Cases in Equity (4th Am. ed.) 1156, 1271; see note to *Huguenin* v. *Basely* and *Lyon* v. *Home,* 6 English Ruling Cases, 873–876; Black on Rescission and Cancellation, § 244, p. 648. This rule has been followed by some of the American courts, notably in New Jersey. See note to *Smith* v. *Smith,* 35 L. R. A., N. S., 959, 960, entitled '' New Jersey — Independent Advice,'' and the cases cited thereunder. After considerable research I have been unable to find any reported case in this state which goes to the length of holding that where an instrument is executed by a person occupying the subordinate and dependent position in a fiduciary or confidential relationship without independent advice that the mere want of such advice renders such an instrument void. The want of independent advice may be a very important factor in determining the validity of a deed or other instrument which is attacked, but upon examination of the cases arising in this state where the so-called rule of '' independent advice '' has been applied it will be seen that such fact appeared in connection with other facts which brought the case within the doctrine of '' constructive fraud,'' and whenever such facts, including the want of independent advice, were established, a case was made out which required explanation and which imposed upon the person benefited by the deed or other instrument the burden of showing that the instrument so executed was the free, untrammeled and intelligent

expression of the wishes and intention of the person so executing the same, and that where no such proof was established courts of equity have treated the case as one of "constructive fraud." *Matter of Smith,* 95 N. Y. 516, 523; *Weller* v. *Weller, supra,* 176, 177; *Green* v. *Roworth,* 113 N. Y. 462, 470; *Anderson* v. *Carter,* 24 App. Div. 462, 478; affd., 165 N. Y. 624. Reverting to the doctrine of constructive fraud, the court in *Butler* v. *Prentiss,* 158 N. Y. 49, 61, defined it as follows: " Constructive fraud, however, sometimes called legal fraud, is, nevertheless, fraud, although it rests more upon presumption and less upon furtive intent than moral fraud. (*Cowee* v. *Cornell,* 75 N. Y. 91, 99.) Where fiduciary relations exist, and a condition of superiority is held by one of the parties over the other, ' in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption.' (Pomeroy's Eq. Jur. § 956.)" In *Green* v. *Roworth, supra,* a father, an aged man who had become much enfeebled mentally and physically, took his two sons into partnership and turned over to them the management and control of his property and business affairs, and was accustomed to rely upon their advice and counsel, and after they had obtained from him the larger part of his property, without any consideration except a provision to pay a small sum weekly from the partnership business, he, without consideration, in the absence of legal advice, executed to them a deed of his real estate in ignorance of its effect, the conveyance leaving him comparatively destitute. In affirming the judgment of rescission the court, among other things, at pages 469, 470, said: " The leading facts of the case have been

15

found and are not impaired by any contradictory find-
ing. They were, substantially, that the deed was
secured by parties who had already obtained the larger
portion of the grantor's property without any
adequate consideration therefor; that this conveyance
left him comparatively destitute of property, and was
made without consideration in the absence of any
legal adviser, by an aged man, whose mental and physi-
cal condition was much enfeebled, and in ignorance of
its legal effect, to persons occupying a confidential
relation towards him, and who had the management
and control of his property and business affairs, and
upon whose advice and counsel he was accustomed to
rely.

"That these facts afford sufficient ground to sup-
port a finding of fraud and undue influence, even with-
out positive or direct proof of persuasion or influence,
cannot be questioned. They present a situation from
which fraud is legally imputable to those benefited, and
requiring an explanation from them, which was not
furnished by the defendants." After quoting from
the opinion of the court in *Cowee* v. *Cornell, supra,*
and *Matter of Smith, supra,* the court goes on to say,
at page 471: "The general rule is stated in Story's
Equity Jurisprudence (§ 238): 'The doctrine, there-
fore, may be laid down as generally true that the
acts and contracts of persons who are of weak under-
standings, and who are, therefore, liable to imposition,
will be held void in courts of equity, if the nature of
the act or contract justify the conclusion that the party
has not exercised a deliberate judgment, but that he
has been imposed upon, circumvented or overcome by
cunning or artifice, or undue influence.'" In *Sheehan*
v. *Erbe,* 77 App. Div. 176, 180, it is said, that "Every
contract must be fair — that is, it must be free from
deceit, fraud or misrepresentation practiced by one of

the contracting parties upon the other, and whenever a court of equity can see that undue and unconscionable advantage has been taken by one of the parties, by reason of a confidential relation existing between them at the time the contract was made, or that they did not then deal upon a plane of equality by reason of the facts stated, it never hesitates to exercise its equitable powers to enforce a right or to prevent the consummation of a wrong.'' Mr. Justice Houghton, who spoke for a majority of the court in *Hunter* v. *McCammon,* 119 App. Div. 326, 328, said: '' Where the relationship between the parties is that of parent and child, principal and agent, or where one party is situated so as to exercise a controlling influence over the will and conduct of another, transactions between them are scrutinized with extreme vigilance, and clear evidence is required showing that the transaction was understood, and that there was no fraud, mistake or undue influence. When these relations exist there must be clear proof of the integrity and fairness of the transaction, else any instrument thus obtained will be set aside or held as invalid between the parties. (*Ten Eyck* v. *Whitbeck,* 156 N. Y. 341; *Green* v. *Roworth,* 113 id. 462; *Rosevear* v. *Sullivan,* 47 App. Div. 421.)'' In *Allen* v. *La Vaud, supra,* the court, at pages 326 and 327, said: '' It is familiar law that certain classes of contracts are inherently subjects of suspicion and scrutiny, and when the assailant of a conveyance has established its character as included within one of these classes he has made a *prima facie* case and cast upon the grantee the burden of showing that it was the product of a fair and honest transaction free from any undue influence. Such transactions are those between guardian and ward, attorney and client and trustee and *cestui que trust* where the dominating party has secured what appears to be a gratuitous

benefit or undue advantage. As was said by Judge Andrews in *Matter of Smith* (95 N. Y. 516, 522): ' When the (this) situation is shown, then there is cast upon the party claiming the benefit or advantage, the burden of relieving himself from the suspicion thus engendered, and of showing either by direct proof or by circumstances that the transaction was free from fraud or undue influence, and that the other party acted without restraint and under no coercion, or any pressure, direct or indirect, of the party benefited. This rule does not proceed upon a presumption of the invalidity of the particular transaction, without proof. The proof is made in the first instance when the relation and the personal intervention of the party claiming the benefit is shown ' (see also, *Nesbit* v. *Lockman,* 34 N. Y. 167). While perhaps it furnishes a less common class of cases, there can be no question that the relation of parent and child may also at times become the basis for the application of this rule of evidence and burden of proof. (*Sears* v. *Shafer,* 6 N. Y. 268, 271; *Wood* v. *Rabe,* 96 N. Y. 414, 426; *Doheny* v. *Lacy,* 168 N. Y. 213, 222.)

" In the case last cited Judge GRAY wrote as follows: ' That rule (of the common law concerning confidential relations as affecting contracts) within the cases, requires as a basis for its application that a fiduciary relation exist between the parties, which will give to the one, in legal presumption, a controlling influence over the other. Such would be the relation of parent and child, guardian and ward. * * * In these confidential relations, the situation of the parties is regarded as unequal and as conferring upon one a certain control, or domination, over the will, conduct, and interests of the other. Transactions between them are, therefore, scrutinized closely, and presump-

tions arise of their impropriety, which must be met
where an advantage is derived by the presumably
dominant party.' "  The rule referred to in the case
last cited was applied in *Adams* v. *Luce,* 181 App. Div.
232, where the transfer was made at a time when the
transferer was in such a weak condition of mind and
body that he was unconscious of the nature of his acts,
which were the result of undue influence exercised by
the defendants.  In reversing the judgment and direct-
ing judgment for the plaintiff setting aside the trans-
fer, the court, at page 233, said: " Transactions of the
sort attempted to be upheld here should always be
closely scrutinized and never permitted to stand unless
it clearly appears that the grantor was fairly conscious
of his acts and of sufficient mentality to be beyond any
possible influence by stronger minds.  (*Allen* v.
*La Vaud,* 213 N. Y. 322; *Rosevear* v. *Sullivan,* 47
App. Div. 421; *Hunter* v. *McCammon,* 119 id. 326.) "
The rule deducible from the foregoing cases and
kindred ones is that any transaction by which one
holding a fiduciary relation to another or any other
relation in which confidence is reposed, and where
he may naturally exercise an influence over the
conduct of such other person, gains an unfair or
inequitable advantage for himself, or which results
in detriment to the other, is presumptively void,
the burden of proof is shifted, and it is incum-
bent upon the person benefited by it to show affirm-
atively, not only that no deception was practiced
therein, but no undue influence was used; that he did
not abuse or betray his trust, and acted in entire good
faith, and that all was fair, open and voluntary, but
that it was well understood by the person worsted in
the transaction.  The evidence adduced on behalf of
the plaintiff in the case at bar was sufficient to cast
upon the defendant the burden of meeting these

requirements, and the next inquiry, therefore, is whether he has done so. As has been shown above, the defendant claims that while he and the plaintiff were alone in their home in the early part of January, 1918, she stated to him that " she wanted to deed the property to him " because he had supported her, and that he stated to her that he would support her while she lived. This is denied by the plaintiff. No witness was called by the defendant whose testimony might even by the most favorable inferences show that such an interview was had with the plaintiff. Neither did he introduce any evidence which in any way tended to show that the plaintiff had at any time expressed to any one other than himself any intention whatever of transferring the absolute title to the property to him. Lord Chancellor Eldon, in the celebrated case of *Huguenin* v. *Basely,* 14 Ves. 273, 294, 6 English Ruling Cases, 834, 846, said that " Where the evidence is contradictory, the fairest way to the defendant is to take his own account." The defendant's account of the transaction is that after he had the above narrated converation with his sister he requested the lawyer, who subsequently and after the commencement of this action was and still is the attorney of record for the plaintiff therein, to draw the deed, and that such lawyer informed him that other matters requiring his attention prevented him from doing so, and that he then had the deed drawn by a lawyer who was a stranger to him and whose name and address he did not remember; that he left the deed with his sister and that he was not present when it was signed and acknowledged. Assuming that the defendant had before the execution of the deed a conversation with the plaintiff of the character testified to by him, it seems to me that in a matter of such importance to the plaintiff, involving as it did her entire property,

the defendant, in view of their close and fiduciary relationship and her weak physical and mental condition and distress of mind and that she was in a dependent position upon him, should, unless he knew that she had already consulted a lawyer as to the alleged contemplated transfer, have suggested to the plaintiff to seek the advice of counsel of her own selection as to the advisability of making it, in case she still adhered to her alleged intention to convey all her property to him in consideration, as he claims, of his past support of the plaintiff and his oral promise to support her in the future. The defendant claims, however, that he requested the lawyer, who subsequently appeared as the plaintiff's attorney in this action, to draw the deed and that, as above stated, such lawyer refused to do so because he was too busy with other matters. The plaintiff's main brief states that the attorney in question refused to prepare such instrument in the absence of the plaintiff, but such statement is not supported by the oath of the attorney, who, although present throughout the trial of this action, was not called as a witness. Giving, therefore, full credence to the testimony of the defendant relative to his alleged interview with the lawyer above referred to, the evidence, nevertheless, fails to show that the defendant suggested to the plaintiff that she consult such lawyer with a view of protecting her interests in the transaction. The defendant was in duty bound to act with the utmost good faith for the benefit of the plaintiff, and that duty did not end when that lawyer refused to prepare the deed. The evidence fails to disclose that the plaintiff ever consulted any member of the family or any friend or any lawyer as to the advisability of making the transfer or the form of the instrument by which it was to be effected. A sense of duty towards his sister, whose mind was greatly weakened from

Supreme Court, July, 1921.     [Vol. 116.

sickness and distress, should have impelled the defendant to refrain from asking her to execute and deliver the deed to him until she had been given competent disinterested advice on the subject in private by some one of her own selection and when not surrounded with dominant influences favoring the transfer. *Nobles* v. *Hutton,* 7 Cal. App. 14. This was not done, however, and the deed which is attacked was signed and acknowledged by the plaintiff without having had the benefit of good and disinterested advice either as to the expediency of what she was about to do or as to the full legal import of the instrument which she signed and acknowledged. All this lends color to the suspicion that the defendant was eager to obtain the plaintiff's signature to the deed irrespective of whether or not she had the benefit of competent disinterested advice in the transaction. Great stress is laid by the defendant upon the fact that he was not present when the deed was signed and acknowledged by the plaintiff, but that fact is not sufficient to show that the influence of confidential relationship which existed between the plaintiff and the defendant did not subsist and operate upon the mind of the plaintiff when the deed was executed. *White* v. *Daly,* (Ch. Ct.) 58 Atl. Repr. 929. As above noted, one of the requirements which the defendant must meet in order to sustain the validity of the deed is to show affirmatively that the transaction which culminated in its execution was fair. He claims that the consideration for the transfer is his past support of the plaintiff and his oral promise to support her for the remainder of her natural life, but the deed states that the consideration was "one dollar and other valuable considerations." The instrument which was executed by the plaintiff is a full covenant warranty deed conveying absolutely and in fee simple the premises to the defendant "subject to mortgage of

$3,500 at five per cent. per annum and interest, now a lien on said premises. Subject also to the building restrictions and regulations contained in a resolution or ordinance adopted July 25, 1916, by the Board of Estimate and Apportionment of the City of New York and amendments thereto.'' The defendant does not claim that the transfer is founded upon any other consideration than the one set up in his answer, and therefore this phase of the case must be decided upon a theory in harmony with the allegations contained in his answer and the evidence adduced by him in support thereof and no other. One part of the consideration for the transfer is based upon the support which the defendant claims to have given the plaintiff '' for a great number of years '' prior to the execution of the deed. A past consideration is sufficient to support a deed. 18 C. J. § 43, subd. 2, p. 163. Although such a consideration may, as here, be founded upon a moral obligation, it may, nevertheless, be a good consideration for a conveyance. *Hegstad* v. *Wysiecki,* 178 App. Div. 733, 735. The question whether or not there was any past consideration for the transfer is one of fact and the evidence in this case with respect to this question is conflicting. The defendant claims that during the time he lived in the house with the plaintiff, and covering a period of about fifteen years, he supported her. This is denied by the plaintiff, who testified that he only gave her twenty-five dollars every two weeks for board and lodging, while the defendant, on the other hand, gave testimony to the effect that he paid her fifty dollars every two weeks. The defendant further claims that since 1905 he has, out of his own funds, paid the taxes, water rents and interest on the mortgage upon the property, repairs and other expenses incident to what he terms the '' upkeep '' of the property, and for coal and other general house-

hold expenses. All this is denied by the plaintiff, who in a general way, but without giving any particulars, testified that the defendant was indebted to her. Although afforded every opportunity, the defendant has not produced any receipts for moneys so claimed to have been disbursed by him of any appreciable amount prior to the execution of the deed. Except in a few instances he was unable to give the items of such alleged expenditures, and he did not even state the aggregate of the moneys claimed to have been expended on behalf of or for the benefit of the plaintiff prior to the execution of the deed. He neither kept a bank account nor books of account, and for that reason, he claims, he is unable to give the particulars of the alleged past consideration for the transfer. It should be pointed out that the alleged past consideration is founded upon the claim that the defendant had supported the plaintiff for a great number of years prior to the execution of the deed. Assuming, without deciding, that the support, if any was given over and above the reasonable value of the board and lodging, was understood by the parties to include the carrying charges of the property, even then the sum total of such charges, so far as I can gather from the meagre facts proven, do not equal the plaintiff's equity in the property. No evidence was offered upon the trial relative to the value of the property at the time the deed was executed. The complaint, verified September 28, 1920, however, alleges that the value of the property is $11,000. If that was the true value of the property at the time last mentioned, then the contract made ten days previously, and dated September 18, 1920, between the plaintiff and a relative by marriage of the wife of Peter C. Kelly, a brother of the plaintiff and the defendant, for the sale of the property for $10,500 would appear not to have been to the advantage of

the plaintiff. It appears from the evidence adduced on behalf of the plaintiff that $500 was paid when the contract was signed, and by its terms the property was to be conveyed subject to a first mortgage for $3,500 (the payment of which was not assumed by the purchaser) and a purchase money mortgage for $4,000 was to be given in part payment of the purchase price, the balance of which, over and above such mortgages and said deposit of $500, was to be paid in cash upon the closing of the title, on September 27, 1920, at the office of the said Peter C. Kelly, who represented the plaintiff in that transaction. That contract was canceled by the mutual consent of the parties, and the $500 deposit was refunded on September 28, 1920, upon discovering the record of the deed in suit in the register's office of Bronx county. A good deal of evidence was offered upon the trial with respect to the said contract, and the counsel for both parties have dwelt upon it in their briefs. As the *bona fides* of that transaction has been seriously questioned by the defendant, it may not be inappropriate to observe that I gravely doubt whether the intending purchaser had sufficient means of his own with which to make the stipulated cash payments under the contract, and whether such contract was to the advantage of the plaintiff. The testimony of the defendant with respect to the alleged past consideration for the transfer is rebutted by that of the plaintiff, who testified that when her mother died she had about $500 in cash and some jewelry, and that after her mother's death she received from her estate the sum of $2,000 in cash, and that when the property was conveyed to her it was free and clear of and from all incumbrances. As tending to show that the defendant did not support her prior to the execution of the deed the plaintiff introduced evidence to the effect that the property is now and has been since

1916 incumbered by a mortgage for $3,500, and which replaced a mortgage for $2,500, made in 1911, and that the alleged transfer of the property to the defendant has left her destitute. The defendant did not offer any evidence either in contradiction or explanation of the evidence so introduced by the plaintiff, except as to the jewelry. Considering the evidence as a whole, I do not think that the defendant has sustained the burden of proof with respect to the question whether there was a past consideration for the transfer. This conclusion leads to the consideration of the questions arising with respect to the defendant's contention that the agreement to continue to support the plaintiff is a sufficient consideration for the transfer. That agreement is not in writing, and it is not even referred to in the deed, which is the only paper that was executed and delivered in the transaction. In some of the cases which arose in this state out of the transfer of property in consideration of the grantee's promise to support the grantor for life the rights and interests of the latter were protected by a provision, either in the deed or by a separate instrument, creating a trust for the benefit of the grantor, or providing that the support should be a lien upon the property conveyed, or where the deed was silent upon the subject by the execution of a mortgage upon the property. *McArthur* v. *Gordon,* 126 N. Y. 597; *Empie* v. *Empie,* 35 App. Div. 51; *Stuart* v. *Abbey,* 62 Misc. Rep. 84; *Hutchins* v. *Van Vechten,* 140 N. Y. 115. Mention of this is made for the purpose of showing that methods have been devised to protect the rights and interests of such a grantor. In the present case none of the methods above indicated nor any others were used by the defendant to safeguard the plaintiff's interests, and he gave no security for the faithful performance of his personal obligation to support the plaintiff. No

reason whatsoever has been shown by the defendant why the plaintiff should have been willing to strip herself of all her property upon his mere oral promise of future support, and without any security that the promise would be kept. It is improbable that she would have consented to such a conveyance if she had the mental power of transacting business requiring good judgment and forethought. *Jackson ex dem. Tracy* v. *Hayner,* 12 Johns. 469, 474; *Marden* v. *Dorthy, No. 1,* 12 App. Div. 176. Her mental weakness and the absence of competent independent advice rendered her incapable of fully understanding and comprehending the transaction. She relied implicitly upon the integrity and good faith of the defendant, who for years had the management and direction of her affairs, and who was the only person who lived in the home with her except the family of the tenant on the top floor. The defendant, however, instead of protecting his sister's interests, took the absolute title to the property without any security for her future support, and in doing so he violated a duty which he owed to her. The transaction was manifestly unfair and greatly to the detriment of the plaintiff and to the advantage of the defendant. The defendant's counsel urges with great force that the defendant faithfully performed the agreement to support the plaintiff until she left the house and went to live with their brother Peter. This is denied by the plaintiff, who testified that she changed her residence because of the insufficiency of food. Whatever the fact may be with respect to the supply of food, the alleged agreement of future support is not in writing, which, if it had been, might have avoided misunderstanding and discord between the parties and would have protected the plaintiff in the event of her surviving the defendant against a denial by his personal representatives that such agree-

ment was made at all, or, if not wholly denied, controverted with respect to its terms and conditions. Either of these contingencies might happen even though the estate be small. The evidence fails to disclose that, exclusive of the premises in suit, the defendant owned at the time of the execution of the deed, or now owns, any kind of property of any substantial value. Even if he did, the provision to support might become unenforcible by reason of his insolvency or removal from the state. The defendant conveyed the property to his brother, Thomas J. Kelly, for a nominal consideration in January, 1921. He claims that such transfer was made at the request of the plaintiff, which she denies. I have already expressed the view that the plaintiff did not fully understand that transaction. In *Rosevear* v. *Sullivan,* 47 App. Div. 421, the plaintiff, who was in a dependent condition to the defendants, conveyed to them her property in consideration of their oral promise to support her during her lifetime and to bury her after her death, and it was held by the Special Term that this created the presumption that the transaction was not fair and that such presumption of unfairness had not been removed by the evidence. In affirming the judgment Mr. Justice Hatch, who wrote the prevailing opinion in that case (at p. 423) said: " While it may be said that the agreement to support, if fairly made upon a full understanding by the parties, dealing upon terms of substantial equality, would furnish a good consideration for the deed, yet where they do not so deal and where one party has the advantage of the other, then the burden is upon the stronger party to furnish satisfactory proof that the transaction was in all respects fair. (*Matter of Will of Smith,* 95 N. Y. 516; *Cowee* v. *Cornell,* 75 id. 91.) And if there be failure in this regard, constructive fraud will be presumed.

(*Green* v. *Roworth,* 113 N. Y. 462.) '' After referring to certain facts connected with the case, the opinion at page 424 goes on to say: '' In addition to this it appears that, while all agree that the consideration for the deed was the agreement to support during life and burial after death, yet such consideration was not recited in the deed and there is nowhere any evidence of the same except in the oral testimony of the witnesses.'' The testimony in that case showed that the plaintiff was old and enfeebled, while the defendants, upon the other hand, were in full possession of all their faculties. In the present case the evidence discloses a weak and impaired intellect on the part of the plaintiff and robust health and a strong will on the part of the defendant, thus indicating feebleness and a mind easily influenced by any one possessing her confidence, upon one side, and comparative strength upon the other. Just as in the *Rosevear* case, the plaintiff in the present action was dependent upon the defendant. There it is stated at pages 423 and 424 of the opinion of the court that the controlling factor in determining whether such a relation existed as precluded the idea that they dealt upon terms of equality was the appearance of the parties themselves, which oftentimes furnished the strongest and most conclusive evidence of the fact, and that the appearance of the parties in that case was the convincing fact which controlled the judgment of the court. As above shown, in such a case as the present one, transactions between the parties are scrutinized with extreme vigilance, and it is incumbent upon the party who has gained the advantage to show affirmatively that the deed was procured without any deception or unfair advantage having been taken and that the injured party fully understood the transaction. In other words, as well stated by Judge Hand in *Cowee*

v. *Cornell, supra,* 100; "* * * that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood." The evidence fails to satisfy me that the defendant has met any of these requirements. Much is made by the defendant's counsel of the testimony of the notary and Miss Krug that the plaintiff stated to them just before signing the deed that she had read and understood the same. These facts are, however, not sufficient in themselves to justify an inference that she comprehended the full legal effect of the paper she signed. Her mind had become very much weakened from illness and anxiety, and it is therefore unreasonable to suppose, especially in the absence of competent independent advice, that she fully understood the transaction. In order to warrant such a finding it must appear that the plaintiff knew and understood what she was doing, which fact will not be necessarily inferred because the instrument she signed may have been read to her, unless it was fully explained by some competent and disinterested adviser and the remote consequences pointed out. See note to *Huguenin* v. *Basely,* vol. 2, part I, White & Tudor's Leading Cases in Equity (4th Am. ed.), 1250; *Russell's Appeal,* 75 Penn. St. 269, 279, 280. There is no claim that the plaintiff had the benefit of such advice either when the transfer was made or previous thereto. While it would appear from the evidence that the plaintiff knew that the paper she signed was a conveyance of her property to the defendant, it does not follow that she comprehended the immediate operation of the instrument and the effect it would produce in the future. I do not think that she possessed sufficient mental power to have enabled her to do so without careful explanation. Judge Story in his Equity Jurisprudence (Vol. 1 [14th ed.], § 329, p. 319), in com-

menting upon conveyances made by weak-minded persons, said: "For it has been well remarked that, although there is no direct proof that a man is non compos or delirious, yet if he is a man of weak understanding, and is harassed and uneasy at the time, or if the deed is executed by him in extremis or when he is a paralytic, it cannot be supposed that he had a mind adequate to the business which he was about, and he might be easily imposed upon." This remark is particularly pertinent to the question whether the plaintiff fully understood the full legal effect of the paper she signed. If she, in her weak physical and mental condition, cannot be supposed to have had a mind adequate to the transaction, so much less is she supposed to have understood the technical language of the deed and its full legal effect, and especially in the absence of competent legal advice. So far as concerns this branch of the case, I am satisfied that the plaintiff did not fully understand the transaction or comprehend the full legal effect of the instrument she signed and acknowledged. From a consideration of the whole case I am clearly of the opinion that the deed from the plaintiff to the defendant should not stand. My conclusion, therefore, is that the plaintiff is entitled to judgment adjudging that the deed from the plaintiff to the defendant is fraudulent and void; that it be surrendered by the defendant and canceled of record; that the plaintiff is the owner of the premises in suit in fee; that the defendant account to the plaintiff for the rents and profits received by him from the premises since January 30, 1918, the date of the said deed; that as the defendant is guilty of only a constructive fraud he be allowed all sums expended by him since the date last mentioned for taxes, water rents, interest on the mortgage upon the premises, fire insurance premiums, improvements, repairs and all

other carrying charges (*Ford* v. *Harrington, supra,* 293; *Mason* v. *Ring,* 3 Abb. Ct. App. Dec. 210, 217; *Lore* v. *Dierkes,* 16 Abb. N. C. 47, 52), and that the plaintiff have the costs and disbursements of this action, but no extra allowance. If the parties are unable to agree upon the sums which should be allowed for rents collected by the defendant and for moneys expended by him for the purposes above mentioned, the decision and judgment may provide that the matter be referred to a referee, who shall report the facts with his opinion thereon. The decision and judgment may also provide that if it is finally determined that the aggregate of the sums so expended by the defendant are less than the sum total of the plaintiff's costs and disbursements and the rents collected by the defendant, the plaintiff shall be entitled to judgment for the difference, but if they are more the defendant shall be entitled to judgment for the excess, and that such judgment shall be a lien upon the premises. As counsel for the respective parties may wish to submit requests to find in accordance with the views above expressed, they are at liberty to withdraw the requests already submitted by them and to substitute new ones instead within ten days after the publication hereof. If there are any other provisions than those above mentioned which either of the parties would like to have inserted in the decision and judgment, they should be incorporated in such new requests for findings. All papers received by me, including exhibits, stenographer's minutes of the testimony of the physicians, briefs, pleadings and filed papers, have been returned to the clerk, to whom all further papers should be handed in, with proof of service.

*Judgment for plaintiff.*