Union Trust Company of Rochester, as Committee of the Property of Melina K. Vogan, Plaintiff, v. Lotta F. Calhoun, Defendant.*

Supreme Court, Monroe County, July 27, 1931.

*Sutherland & Dwyer* [*Samuel Dicker* and *Timothy M. Keenan* of counsel], for the plaintiff.

*Macomber & Skivington*, for the defendant.

Rodenbeck, J. When the facts and circumstances concerning the relations of the parties to these joint accounts are examined, they indicate a fraudulent intent on the part of the defendant to secure the moneys and other property of the incompetent. She has completely succeeded in this attempt, and has in her possession all of the life savings of the incompetent, while the latter is confined in the Rochester State Hospital as a charity patient. The facts and circumstances in the case point to a persistent effort on the part of the defendant to defraud the incompetent of her savings.

The relation that the incompetent sustained to the defendant was that of a domestic servant. There was no other relationship existing between them. This relation, however, became confidential and the defendant, in the transactions in question, abused this confidence and imposed upon the incompetent to the extent of acquiring all of her property and leaving her a pauper to be

* Affd., 234 App. Div. 726.

supported by the public. The young lady who lived with the defendant, who had taken the defendant's name but was not legally adopted, testified that the incompetent was treated as a member of the family.

The incompetent was sixty-two years of age when she first went to work for the defendant, and, during her simple and industrious life, she had accumulated considerable money which was on deposit in banks in the city of Rochester in her own name.

The first step in the effort of the defendant to obtain control of the incompetent's property was to secure the withdrawal of $500 from one of the bank accounts of the incompetent and have it deposited, October 9, 1923, in a joint account in the names of " Melina K. Vogan and Lotta F. Calhoun, either or the survivor may draw."

The next step was to have transferred to the defendant's safe deposit box the contents of the safe deposit box of the incompetent, June 25, 1924. This gave the defendant control of the bank books and other papers of the incompetent, and put her in a position where she could complete her plans to secure all of the incompetent's savings.

Thereafter, two other joint bank accounts were opened in the same names as the previous one, December 30, 1924, and, in time, all of the moneys in the banks belonging to the incompetent were transferred, without any consideration whatever from the defendant, to these joint accounts.

When these joint bank accounts were completed, the defendant had some doubt about the accounts, and she took the incompetent to her attorney, the latter part of the year 1925, to discuss the transfer of the accounts to her individual name. This course was disapproved by the attorney, and the nature of a joint account was explained, and it was suggested that, in order to take care of any other property, a will should be made out in favor of the defendant.

Thereafter the defendant and her husband went south for the winter. In May of the following year, 1926, the incompetent suffered a stroke of apoplexy while at her brother's home. The defendant, then, fearful of the moneys in the joint accounts, proceeded to withdraw them from the joint accounts and to place them in her individual name; June 8, 1926.

The incompetent, sick and unable to work and being then of no further use to the defendant, was placed in St. Mary's Hospital, the Monroe County Hospital, and, then, sent for a short time into the country, and, later, placed in St. Ann's Home, the almshouse of Monroe county, and the Monroe County Hospital, as a

charity patient, and, finally, in the Rochester State Hospital as insane, where she now is.

Not only has the defendant appropriated to herself all of the savings of the incompetent, deposited in the banks of the city, but she has assumed to take possession of a fur coat, a small legacy belonging to the incompetent, the contents of a registered letter, and all of the personal effects of the incompetent.

What made the influence of the defendant so potent and the consummation of the fraudulent scheme of the defendant so easy was the mental condition that the incompetent was in during the years when the joint accounts were opened, and when the funds were transferred from these accounts to the individual name of the defendant, and when the other transactions between the parties occurred. She was not insane, but she was in the incipient stages of a mental condition which subsequently developed into insanity. Lay witnesses were called on behalf of the defendant to testify to her acts and conduct while employed by them during a part of the period when the joint accounts were opened, and they testified that her acts were rational. But the testimony of the expert, called on behalf of the incompetent, shows that she would be able to work, although suffering from the incipient stages of the mental disease which subsequently developed, and that her condition might not be revealed to her employers. This expert, who was the superintendent of the State hospital where the incompetent is confined, was not willing to say that she was insane during the time that the joint accounts were opened, but he did say that he was of the opinion " that she was not competent." The defendant told a former employer of the incompetent, in 1919, that the incompetent was acting strangely and was mentally unbalanced, which was not denied by her. This evidence was not overcome by any evidence on the part of the defendant, and may not be sufficient to set aside the transactions on the ground of the insanity of the incompetent, but, nevertheless, it has a strong bearing upon the mental condition of the incompetent which enabled the defendant to accomplish the appropriation of all of her life savings.

The cupidity of the defendant is further illustrated, and her desire to accomplish the appropriation of everything the incompetent possessed is further revealed, by her employment of an attorney to come to her house June 1, 1926, after the incompetent had suffered the stroke of apoplexy, and by the payment to him of his fee for drawing a will, which the incompetent was only able to execute by making her mark. This action of the defendant also supports the conclusion that the defendant realized the questionable character of her right to the moneys in the joint

accounts, and, therefore, resorted to the execution of the will, so that, if the appropriation of the joint accounts failed, she could still have recourse to the will. The execution of this will at a time when the incompetent was so ill that she could not sign her name favors the conclusion that the incompetent intended to retain control of her property until her death, and that the joint accounts were a mere matter of convenience.

If the transactions relating to the joint accounts were had in good faith, the defendant would not be making misrepresentations with reference to the moneys of the incompetent for the purpose of misleading those who were interested. To the officers of the bank, which has been appointed a committee of the incompetent, she reluctantly mentioned one of the joint accounts, and said that it had been placed there for the purpose of meeting funeral expenses, saying masses, and care and maintenance, and, later, admitted that there was another joint account to be used for masses. This statement of the defendant, not denied by her, probably indicates the purpose for which the joint accounts were opened.

Before the moneys in the joint accounts were transferred, however, in answer to a letter received from the incompetent's brother, who was seeking a loan from his sister, the defendant wrote, February 10, 1926: " I do not think she wants to loan any money at her age. She has not got any more than will take care of her and if she is sick a long time it would not keep her." This statement by the defendant indicates that the moneys in the joint accounts belonged to the incompetent and that the defendant did not claim that any part of them belonged to her.

When a former employer of the incompetent learned of the incompetent's illness, and spoke to the defendant about it, inquiring why the incompetent was not placed in some institution, the defendant replied that the brother and nephew of the incompetent had taken her money from her; and to the brother, who made a similar inquiry about the incompetent's money, the defendant said that it had been given to an orphan asylum.

These misrepresentations of the defendant, taken together with all of the other facts and circumstances in the case, stamp the acts and conduct of the defendant towards the incompetent, in relation to the creation of the joint accounts and the transfer of these accounts to her individual name, as a fraudulent abuse of a confidential relation.

The fraudulent character of the transactions is further confirmed by the conduct of the defendant in appropriating, without consideration, other property belonging to the incompetent, con-

sisting of a fur coat, which was taken out of storage in the summer, a small legacy sent to the incompetent through the mails, the contents of a registered letter, and her personal effects.

The facts and circumstances cry out against the injustice that has been done to this incompetent, and the rules of law are not so rigid that the courts cannot afford relief. ·(*Allen* v. *Lavaud,* 213 N. Y. 322; *Matter of Smith,* 95 id. 516, 522; *Ten Eyck* v. *Whitbeck,* 156 id. 341, 353; *Rosevear* v. *Sullivan,* 47 App. Div. 421; *Babcock* v. *Clark,* 79 id. 502; *Hunter* v. *McCammon,* 119 id. 326; *Kelly* v. *Kelly,* 116 Misc. 195.) "The law is not so impracticable as to refuse to take notice of the influence of greed and selfishness upon human conduct, and in the case supposed it wisely interposes by adjusting the quality and measure of proof to the circumstances, to protect the weaker party and, as far as may be, to make it certain that trust and confidence have not been perverted or abused." (*Matter of Smith, supra,* 523.) "Where one party is situated so as to exercise a controlling influence over the will and conduct of another, transactions between them are scrutinized with extreme vigilance, and clear evidence is required that the transaction was understood, and that there was no fraud, mistake or undue influence. Where those relations exist there must be clear proof of the integrity and fairness of the transaction, or any instrument thus obtained will be set aside or held. as invalid between the parties." (*Ten Eyck* v. *Whitbeck, supra,* 353.)

The plaintiff, as the committee of the incompetent, is entitled to an accounting from the defendant of all of the property of the incompetent which came into her hands.

So ordered.